## LANGFORD v. EL PASO BAKING CO.
### (No. 2092.)

Court of Civil Appeals of Texas.  El Paso.
Dec. 8, 1927.

Rehearing Denied Jan. 5, 1928.

**1. Master and servant ⊜⟿332(2)—Evidence that automobile driver was acting in scope of employment or in furtherance of employer's business held insufficient for jury.**

In action for injuries in collision between automobiles, evidence *held* insufficient to take to jury question whether driver of defendant's car was acting in scope of employment or in furtherance of defendant's business.

**2. Trial ⊜⟿139(1)—Evidence raising only surmise or suspicion is insufficient for jury.**

Evidence so weak in probative force as to raise only a surmise or suspicion of existence of fact necessary to be proven is insufficient to warrant submission of issue to jury.

**3. Trial ⊜⟿139(1)—Trial court must determine whether evidence raises more than surmise or suspicion, so as to warrant submission of issue to jury.**

It is trial court's duty to determine whether evidence is sufficient to raise more than a surmise or suspicion of existence of fact necessary to be proven, so as to warrant submission of issue to jury.

**4. Master and servant ⊜⟿330(1)—One suing for injuries by automobile must show driver was engaged in defendant's service.**

In action for injuries in collision between automobiles, it was necessary for plaintiff to show that driver of defendant's car was engaged in defendant's service at time.

**5. Evidence ⊜⟿89—Presumption is destroyed by clear and convincing proof to contrary.**

A presumption disappears when it is shown by clear and convincing proof that the fact inferred is without foundation.

Appeal from District Court, El Paso County; B. Coldwell, Judge.

Action by J. M. Langford against the El Paso Baking Company.  Judgment for defendant, and plaintiff appeals.  Affirmed.

Jones, Hardie & Grambling, of El Paso, for appellant.

Kemp & Nagle, W. W. Bridgers, and E. R. Smith, all of El Paso, for appellee.

HIGGINS, J.  This is an action by Langford against the El Paso Baking Company to recover damages resulting from personal injuries sustained by appellant in a collision on Texas street in El Paso, Tex., between a Ford car driven by appellant and a Hudson sedan owned by E. R. Cole, manager of appellee, and driven by Dale Jackson, an employee of appellee.  At the close of the evidence a peremptory charge in the defendant's favor was given.  This is the only error assigned.

The collision occurred about 5:15 p. m. December 24, 1926.  Plaintiff was operating a filling station on the south side of Texas street on the northeast corner of the block, at the intersection of Texas and Palm streets.  He drove his car out of the filling station on the west side thereof, going directly or diagonally to the north side of Texas, intending to go west upon Texas street.  Just as he reached the north side of Texas street and his car facing west, it was struck on its south side by the Hudson sedan driven by Jackson, going east.  It was alleged that Jackson, in violation of law, was driving 40 miles an hour and upon the left side of the street, which caused the injuries.  Defendant denied that Jackson, at the time, was acting in the scope of his employment or in furtherance of its business.  It also pleaded contributory negligence on the part of plaintiff in entering Texas street from the south and crossing directly to the north side of the street instead of going east to the intersection of Palm street and there turning north and thence west, as the ordinances of the city required him to do when he entered Texas street at the point he did, intending to go west.

[1] The evidence sustains the allegations of negligence pleaded by plaintiff and that same proximately caused the injury.  It also shows that plaintiff was guilty of negligence per se in violating the ordinances of the city above referred to, but it is questionable whether such negligence on his part can be held, as a matter of law, to have been a concurring proximate cause of the injury.  It is unnecessary to consider this phase of the case, for we are of the opinion the peremptory charge was properly given, for the reason that in the state of the evidence reasonable minds cannot differ in the conclusion that, at the time of the collision, Dale Jackson was not acting in the scope of his employment by the defendant nor in furtherance of its business.

Defendant ws engaged in baking bread in El Paso, its bread being known as "Merit bread."  It did not sell at retail except stale bread, which it would sell to those who called for same at its place of business.  The only deliveries it made was of its fresh bread in wholesale lots.

E. R. Cole, defendant's manager, testified:

"I remember the occasion of the accident out here on Texas street in December.  Dale Jackson was employed by the El Paso Baking Company at that time.  There was no transaction at that time with reference to taking bread anywhere for the bakery.  Dale Jackson come in and asked to borrow one of the roadsters or cars to take some bread home for one of the ladies in the office, and some Christmas packages, and I refused it.  Miss Dowell was

⊜⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

working for the baking company at that time, and so was Dale Jackson. Miss Dowell had bought some stale bread and some fresh bread from the company. She had been in the habit of buying stale bread from the company, and used it to feed a dog and cat. On this evening we are speaking of, she had, as previously, bought some of this stale bread. Our company never makes deliveries of stale bread. Miss Dowell had bought the bread and paid for it, the transaction was closed, and we were through with it. Something was said by Dale Jackson about using one of the company wagons to make a delivery to her. I judge Dale had been working for the company about four months at that time; he was shipping clerk. He checks bread out to the drivers and puts up all country shipments. The only deliveries he makes are to the post office and express company early in the morning. His duties consist of checking bread and making deliveries to the express office and post office. Dale was not on duty and working at the particular time of this transaction. Dale asked me for permission to use one of the trucks to take the bread and packages for Miss Dowell to her home, and I refused to let him use the company equipment, and told him, if he had to go out, to use my personal car. That was an independent transaction on behalf of Dale Jackson and Miss Dowell. I just told him he could use my car if he wanted to take it out. That was the sum and substance of the transaction with reference to delivering the bread. Dale Jackson was not representing me in delivering the bread, and I had no interest in the delivery of it. I gave him no directions or instructions with reference to the delivery. In about ten minutes I got a telephone call from Dale. He said, 'I have wrecked your car.' I then jumped in the roadster I had there and went to 2228 East Texas, where I found my car wrecked and Mr. Langford's. I arrived there just as the police stopped. I had my sales manager with me, and Dale was picking up bread and putting on the running board. I went to see if he was hurt; he was scared to death, that is all, and I took him to Mr. Langford's filling station. Mr. Langford was sitting in a chair, something like he is now, leaning back, with a cut over his right eye. I asked him how bad he was hurt. He said he didn't know; he was scared pretty bad. I said, 'Let me call a doctor;' he says 'No; I don't need a doctor;' I said, 'Well, you better have a doctor, you may be hurt worse than you think;' he says 'I am not hurt but a cut over my eye; I don't need a doctor.' I stood around to see if I could get witnesses that seen the accident. I only found one; no one else had seen it. I got that boy's name and address, and went and talked to the police, and we made an examination; then I went back to the plant. * * *

"Dale Jackson was not performing any business for the baking company in taking my Hudson automobile to deliver this stale bread. Dale's hours for work at the bakery were different hours, different nights. Last Christmas Eve I believe Dale came to work about 10 o'clock p. m. Friday night, and was off at noon Saturday. Saturday was the 24th of December, 1926. He worked two shifts that night, part of one and the whole of another.

He was off at 12 o'clock the next morning. He just come in about 4 o'clock that afternoon, I believe it was Christmas Eve, and there was several of the boys there. During Saturday evening lots of them come by there that don't have anywhere to go. His folks weren't here, and he usually come over and talked with salesmen or something. He was not on duty at that time, and was not working for the bakery company at that time. He had been home all afternoon. For making deliveries, the baking company has two three-quarter ton Whites, and seven one-ton Fords, one three-quarter ton Ford light delivery, and one Ford roadster. All those are company cars, and are used for delivering bread. We do not sell bread retail, only stale bread, and we do not make any deliveries to private individuals. Our company does a wholesale business, and we sell to groceries and restaurants. At the time Dale Jackson asked me for the use of a company truck, there were two trucks, light delivery, and the Ford roadster there, and I refused him permission to use one of the company trucks. My reason for doing so was because we don't use company trucks for personal business. If one of our employees buys bread, we don't deliver it for the employee, and, if an individual comes along and buys stale bread, our company does not make deliveries for this individual. I know now what packages were put into the Hudson automobile; I didn't when it went out, but I saw them when they came back. There were about twelve or fourteen loaves of bread, there was one five-pound fruit cake, and there were two or three little packages, I don't know what they contained. I know how the fruit cake got there. I had made a Christmas present of it to Miss Dowell's sister-in-law, and she was taking it home. That gift was made by me personally. I have to account for every pound of fruit cake that I receive. After the bread was picked up out there, it was taken back to the plant, and Miss Dowell's brother came and got it the next day, which was Christmas morning. * * *

"I believe Miss Dowell had been working there for about fifteen months; she was there before I came. She was one of our regular employees, and had been some time. Our company does not make a practice of making presents to its employees at Christmas time. When I said that I had to account for the fruit cake, what I meant was that we don't bake fruit cake here; it is shipped from another plant to us, inventoried, and we have to lock it up and account for every pound that goes out. Some of the bread Miss Dowell had bought was stale and some was fresh; I couldn't say how much of each; I don't remember. I didn't sell the bread to her, and I don't remember; I didn't examine it. As I stated, there were fourteen or fifteen loaves of bread. She fed some to a dog and cat, and I guess they used some to stuff a turkey, because they had turkey. I testified before by deposition, and I testified that she wanted to use that stale bread for dressing next day. I got that information because I was out there for dinner, and she told me then that she had gotten it to use for dressing. I said this boy came to me of his own accord and asked for the use of the car, and I volunteered the use of the other car. He did that of his own accord; I didn't

instruct him to do that, and I didn't ask him to do it. I told him to go ahead and use the Hudson. His going out and delivering this bread and this fruit cake and other articles was done at his request, and I didn't ask him to do it. As to the following statement in my deposition: 'I asked him to deliver some of my own personal packages for me, and one of the ladies in the office had some stale bread she was to use for dressing the next day, which was the bread found in the car'—well now I wouldn't swear that was my statement; it probably is, but I won't swear to it. I didn't have any personal packages except one fruit cake. I had given a fruit cake as a Christmas present to Miss Dowell's sister-in-law. Dale came and asked me, in the first place, for the use of the car, and I told him 'No.' * * *

"We surely do have a busy time down there on Christmas Eve. The little stores around town don't call us up frequently for more bread; we don't do business that way. We have salesmen that work on commission, and they order their own order and make the deliveries themselves. The stores do call, and we send a salesman down; these men work on commission. If the salesman isn't there, we have a sales supervisor, who goes and finds the salesman on that particular route. We don't have the bread on hand to deliver; we don't make extra on Christmas Eve, and we have no one to deliver; we have a sales supervisor and he gets the salesman. We have two spare trucks all the time to relieve any truck that may have trouble; we have a light delivery which carries express to the depot and parcel post to the post office, and I have a Ford roadster which the supervisor uses in case he hunts salesmen. If we get a call from a certain salesman's territory, we have a route book with the time marked in it, and the supervisor looks up that salesman so he can deliver that personally. Occasionally we have merchants where we send it direct from the office if there is bread on hand. There was none at that time. Part of the fifteen loaves was stale bread; we don't deliver stale bread; and the other part the lady had bought from one of the salesmen. No; we didn't have that on hand; it belonged to Miss Dowell. We had completely run out of bread. She got fifteen loaves of bread; there was two days we didn't work. When they phoned into the office about the accident, I went out immediately. I offered to call up a doctor. * * *

"The bread was picked up and put in my roadster, the company furnishes that. I didn't keep any accurate record of how many loaves of bread there were, I judge about fifteen; I didn't count the number. I don't know whether I testified there were eight before; I might have said about eight, ten, twelve, it might have been sixteen, I don't know. No, sir; it might not have been twenty-five; you couldn't get twenty-five in that box. It was a shipping carton, about that square, made out of cardboard. It belonged to the El Paso Baking Company; that is what our cake comes in. We have baskets about that long, about that wide, and that deep, but there were none there at the time; those were all on the routes; the salesmen have to buy those; each salesman has his own basket. When we deliver bread

and there is no salesman, we have paper cartons, and this was a paper carton. * * *"

W. L. Dowell, brother of Miss Dowell, testified:

"On Christmas day, last year, I made a trip from home down to the bakery in the morning, and got a box and took it home. The box contained bread, a fruit cake, and some personal packages. That was Christmas morning of the year 1926."

Miss Dowell testified:

"My name is Nora Dowell, and I am employed by the El Paso Baking Company. I was employed there in December of 1926; I had been working there a little better than a year. I am chief clerk. I remember an occurrence last December 24th. I bought stale bread from the company, but I bought the fresh bread from one of the salesmen. The company does not sell fresh bread directly to any person, only stale; anybody can buy that. When you buy fresh bread, you ordinarily buy it from the grocery, but if you remember what an ugly afternoon it was, and my sister couldn't go to the store and my brother was out of town, so I bought it from the salesman that sells to the store where we get our bread. I had nine fresh loaves, and I don't remember how many stale, not more than six. It was a two-day holiday, and the fresh bread was to use for the family, we were going to have company, and the stale was for stuffing and for the dog, and we also have a cat at home, and they are very fond of bread. I also had a fruit cake that Mr. Cole had given my family, my sister-in-law, and some packages, you always have a little Christmas Eve shopping, I don't know what was in them, four or five. I asked Dale Jackson if he would deliver those; I didn't have any way of getting it out, only on the bus or street car, and it was too much to carry. Dale Jackson just dropped in that afternoon, like any of the others they drop in any time during the day; they feel like it is home if they don't have a home; they come in and chat. The boys at night don't get to see the salesmen unless they drop in later in the day. He was not working at that time. I don't know how long he had been in the place of business when I asked him to deliver these, quite a while. He had been sitting around talking, and I didn't have any way to get these out, so I asked him if he would take them out. Mr. Cole overheard and said he couldn't use company equipment. I don't know whether he asked Mr. Cole or Mr. Cole overheard and said he couldn't use the company equipment. It is a rule you can't use company equipment only on company business, and this was personal business entirely. The company does not deliver any stale bread either to me or anybody else. The company doesn't deliver any other bread I might buy. Unless it is an occasion like that, I never buy any fresh bread there. My sister couldn't go to the store, and my brother was out of town, and I bought from the salesman. My brother was supposed to come back later that evening, and my sister told me he couldn't come for me at all. The packages Dale Jackson was delivering belonged

to me, except the fruit cake, which belonged to my sister. I was at the plant when these packages were brought back by Mr. Cole. They were all left in the box, and my brother came the next morning for them."

Cross-examination:

"I am still employed down at the El Paso Baking Company. On that afternoon I was the one that asked Dale Jackson to make this delivery for me. He was making it especially for me. He wasn't making any delivery for Mr. Cole except for the fruit cake. I asked him to take these packages there. I don't know whether he asked Mr. Cole personally for the use of the car or was just talking; it is a small office and you can't say anything that anybody can't hear. Mr. Cole said, 'You cannot use company equipment.' "

Dale Jackson testified:

"My name is Dale Jackson. I was driving this Hudson car, on Christmas Eve, that had a collision with Mr. Langford's car on Texas street. I started to work for the El Paso Baking Company two or three months before Christmas. I am still working for them as shipping clerk. My duties as shipping clerk are to check the seven drivers and do all country shipping. I also make deliveries to the express office and post office every morning. That embraces all of my duties; I did nothing else. The evening that this accident occurred, that I undertook to make this delivery, I was not on duty or working for the baking company at that time; I had gone off duty at noon. I went off duty at noon and went home and slept probably three 'or four hours, then I got up and came back to the shop and was just sitting around in the office talking. Miss Dowell asked me what I was doing; I told her nothing in particular; and she asked me if I would make this little delivery. I says, 'Sure, I have nothing else to do and might as well do that as anything else;' and something was said about using the 'shag' —that is the light delivery. I turned to Mr. Cole and says, 'How about it?' He says, 'Absolutely not.' He says, 'You can use my Hudson if you want to make any personal deliveries;' and I started on out. and he says, 'By the way, you can take that fruit cake along with you; Miss Dowell is going to take it home to-night;' and I put it in the box with the bread and started out. That was substantially all there was to that conversation with reference to making this delivery; that about covers all that was said about it. * * * "

The facts upon which appellant relies as sufficient to carry to the jury the issue of whether Jackson was acting in the scope of his employment and in furtherance of the defendant's business, briefly stated, are as follows: At the time of the accident, there were between fifteen and twenty-five loaves of bread, made by defendant, in the car driven by Jackson, which, after the accident, was picked up and put in a car belonging to defendant; that the bread was being carried in a carton belonging to defendant and used for delivering its bread; after the collision the manager Cole went to the place thereof in one of defendant's cars, and when he reached there asked Langford to let him call a doctor.

Upon these facts it is argued the jury might have disbelieved the testimony of the witnesses quoted, and might have rightfully inferred that at the time of the accident Jackson was making a delivery of bread for defendant to one of its customers.

[2, 3] As we view the circumstances to which appellant refers, they raise no more than a surmise or suspicion that Jackson at the time of the accident was making a delivery of bread for the defendant and thus in furtherance of its business. Evidence which is so weak in its probative force as to raise only a surmise or suspicion of the existence of a fact necessary to be proven is insufficient to warrant submission of the issue to the jury, and it is the duty of the trial court to determine whether the evidence has more than that degree of probative force. If it does not, the issue should not be submitted. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

[4, 5] It was necessary for the plaintiff to show that Jackson at the time was engaged in the defendant's service, and at best this could be inferred only from the circumstances referred to by appellant. A presumption disappears when it is shown by clear and convincing proof that the fact inferred is without foundation. Paxton v. Boyce, 1 Tex. 317; Largen v. State ex rel. Abney, 76 Tex. 323, 13 S. W. 161; Ins. Co. v. Heath, 29 Tex. Civ. App. 445, 69 S. W. 235.

The testimony of all the various witnesses in position to know the true facts shows that Jackson was not engaged in his master's service at the time of the collision, and there is nothing to cast any suspicion upon the verity of their testimony.

In questions, such as here presented, every case in large measure depends upon its own facts, but the following cases support the view that the court did not err in refusing to submit this case to the jury: Van Cleave v. Walker (Tex. Civ. App.) 210 S. W. 767; Christensen v. Christiansen (Tex. Civ. App.) 155 S. W. 995; Kirby Lumber Co. v. Boyett (Tex. Civ. App.) 221 S. W. 669; Joske v. Irvine, supra.

Affirmed.