## McVEIGH v. INTERNATIONAL TRAVEL-ERS ASSUR. CO.

### No. 12069.

Court of Civil Appeals of Texas. Dallas.
Dec. 12, 1936.

Dissenting Opinion Dec. 17, 1936.

Rehearing Denied Jan. 23, 1937.

Caldwell, Gillen, Francis & Gallagher, of Dallas, for plaintiff in error.

Malone, Lipscomb, White & Seay, of Dallas, for defendant in error.

LOONEY, Justice.

Mrs. Bessie McVeigh, widow of Townsend A. McVeigh, sued the International Travelers Assurance Company to recover on an accident policy insuring the deceased, alleging, among other things: "That heretofore, towit, on or about the 17th day of April, 1932, the said Townsend A. McVeigh met with an accident, in that he accidentally fell in the bathroom of his home in the City of Dallas, Texas, as hereinafter

more fully alleged, whereby he sustained serious injuries to his abdomen, the organs of the abdominal cavity and to his spine, which injuries within ninety days of said accident, to wit, on or about the 4th day of May, 1932, resulted fatally to the said Townsend A. McVeigh directly, independently and exclusively of all other causes. * * * that on or about Sunday night, April 17th, 1932, while at his said home, taking a shower bath in the bath tub and while standing in the bath tub the said Townsend McVeigh, now deceased, accidentally slipped and fell from the bath tub with great force and violence backward to the tile floor below, striking the floor with his head, back and abdomen and did then and there injure and rupture his appendix, severely damaging, aggravating and injuring his appendix, causing the same to rupture and burst, which in turn produced a condition in the said Townsend A. McVeigh's body, known as peritonitis; that plaintiff was in another room in said house, and, hearing the impact of said fall rushed to her husband's assistance and found him on the bath room floor in a helpless position, unable to rise; that plaintiff's said husband did then and there immediately suffer pain in his back, side and abdomen; that he refused to eat, and suffered continuous pain until the following Wednesday, April 20, 1932, when he was taken violently ill; that he was immediately taken to a hospital where he was operated upon on said date for traumatic appendicitis from the natural effects of which he died on May 4, 1932, and which was the direct and natural cause of his death."

The policy was alleged to have been executed by defendant, International Travelers Assurance Company, was attached to plaintiff's petition as an exhibit, but purportedly was executed by International Travelers Association; however, no plea of non est factum was filed by the defendant. The insuring clause of the policy is against "loss resulting from bodily injuries effected directly, independently and exclusively, of all other causes through accidental means." At the conclusion of plaintiff's evidence, defendant moved for a peremptory instruction, which was granted, judgment thereon was entered that plaintiff take nothing, from which she appealed.

The first question presented is this: Was there a fatal variance, between allegation and proof? The policy alleged to have been executed by the defendant, attached as an exhibit to plaintiff's petition, and introduced in evidence, without objection, purportedly was executed, not by defendant, International Travelers Assurance Company, but by the International Travelers Association.

The doctrine seems to be well settled that, in the absence of a plea of non est factum, an instrument upon which a pleading is based, alleged to have been executed by the party sought to be held, is admissible in evidence without proof of its execution, and is binding on such party, although upon its face the instrument purports to have been executed by another. See Bradford v. Taylor, 61 Tex. 508; City Water Works v. White, 61 Tex. 536, 539; Harris v. Wheeler (Tex.Civ.App.) 255 S.W. 206, 209; Thomason v. Berry (Tex.Com.App.) 276 S.W. 185, 186.

In City Water Works v. White, supra, speaking for the Supreme Court, Judge Stayton said: "That the instrument is ambiguous, and does not clearly purport to be the act of the defendant, does not render it any the less an 'instrument in writing upon which any pleading is founded in whole or in part, and charged to have been executed by him (the defendant) or by his authority.' In a number of cases in which the instrument on its face did not clearly appear to be the act of the person who sought to show that it was not executed by him or by his authority, it has been held that the person setting up such defense must do so by an answer verified by his affidavit. Drew v. Harrison, 12 Tex. [279] 280; Reid v. Reid, 11 Tex. [585] 591; Persons v. Frost & Co., 25 Tex. Supp. [129] 130; Prince v. Thompson, 21 Tex. 480; Sessums v. Henry, 38 Tex. [37] 41; Ferguson v. Wood, 23 Tex. 177; Lewis v. Lowery, 31 Tex. 663; May v. Pollard, 28 Tex. [677] 678. If the statute in terms referred only to such instruments as on their face purport to be the act of the person by whom or by whose authority such instruments are alleged to have been executed, then a different rule might be applied. * * * It may be that the statute which requires the plea by which the execution of an instrument sued on is put in issue to be verified by affidavit, in reason ought to apply only to such instruments as on their face clearly import to be the act of the party; but this was a matter for the consideration of the legislature, and not for the judiciary."

As the policy sued upon was attached as an exhibit to plaintiff's petition,

we do not think a variance between allegation and proof could exist. Longley v. Caruthers, 64 Tex. 287, 288; Varn v. Arnold Hat Co. (Tex.Civ.App.) 124 S.W. 693, 694; Abilene, etc., Co. v. Southwestern, etc., Co. (Tex.Civ.App.) 185 S.W. 356, 362; Freiberg, etc., v. Magale, 70 Tex. 116, 7 S.W. 684; Beham v. Ghio, 75 Tex. 87, 12 S.W. 996.

In Longley v. Caruthers, supra, Chief Justice Willie, speaking for the Supreme Court, said: "The instrument sued on having been attached to the petition as an exhibit, there could be no variance between the allegation and the proof when it was offered in evidence. 'This is upon the ground that the instrument thus made a part of the petition, and filed with it for the inspection of the defendant, must control and cure any misdescription of it in the body of the petition.' Pyron v. Grinder, 25 Tex.Supp. 159; Spencer v. McCarty, 46 Tex. 213."

■ However, because of admissions in its pleading, the defendant is in no position to deny that the policy sued upon is its contract. In a special plea seeking to avoid the payment of attorney fees, defendant alleged that, while the policy was issued by the International Travelers Association, defendant had reinsured the risk "assumed and bound itself to pay and discharge all liability of the International Travelers Association under the policy attempted to be sued upon, and/or any other policy written by the International Travelers Association."

■ Early in our judicial history the doctrine was announced, and has persisted, that, "If one party expressly avers or confesses a material fact omitted on the other side, the omission is cured. It may thus be made to appear from the pleadings on both sides that the plaintiff is entitled to the judgment, although his own pleading, taken by itself, is insufficient. Hence, it may be seen that, although the plaintiff committed the first fault, the defendant has remedied it, and cannot now complain. See Hill v. George, 5 Tex. [87] 89, 90." To the same effect see Grimes v. Hagood, 19 Tex. 246, 247; Bosse v. Cadwallader, 86 Tex. 336, 24 S.W. 798; Willson v. Crawford, 61 Tex.Civ.App. 580, 130 S.W. 227, 230; Chapman v. Mooney (Tex.Civ. App.) 257 S.W. 1106, 1108; Wyatt & Wingo v. White (Tex.Com.App.) 228 S.W. 154, 156; Amsler v. Cavitt (Tex.Civ. App.) 271 S.W. 139, 140; Lafield v. Maryland Casualty Co., 119 Tex. 466, 33 S.W. (2d) 187, 188; Caulk v. Anderson, 120 Tex. 253, 37 S.W.(2d) 1008.

For reasons stated, we fail to find the existence of a variance between pleading and proof, therefore hold that the court erred in directing a verdict on the assumption, if it did assume, that a fatal variance existed.

The next question presented is this: Considering the evidence in the light most favorable to plaintiff, and disregarding all conflicts and contradictions, did it raise more than a mere surmise, suspicion, or possibility that the death of Townsend A. McVeigh resulted from the bodily injuries affected directly, independently, and exclusively of all other causes through the accidental means shown?

■■ A reviewing court, in determining whether a verdict should or should not have been directed, will disregard all conflicts and contradictions that may appear, and consider the evidence in the light most favorable to the party against whom the verdict was directed; in other words, every intendment fairly deducible from the evidence will be made in favor of the losing party; indeed, it is said that a reviewing court must disregard testimony favorable to the party for whom the verdict was directed and consider only the evidence favorable to the losing party. 3 Tex. Jur. § 741, pp. 1049, 1050. On the other hand, it is equally true that it is the duty of a trial court to instruct a verdict, though there be but slight evidence, if its probative force is so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such being in legal contemplation no evidence whatever. Joske v. Irvine, 91 Tex. 574, 582, 44 S.W. 1059.

Cases in which these opposing rules were applied are numerous, but are of no real value as precedents, as each was governed by its own peculiar facts; therefore, the question for our consideration is, Which of these rules is applicable here? To properly determine the question, we are compelled to review the facts at some length.

Plaintiff testified that, while her husband was taking a bath on the evening of April 17, 1932, he slipped and fell heavily from the bathtub, the noise of the impact being heard by persons in different rooms of the house; that witness rushed to the bathroom, found her husband on the floor, on

his back with feet in the tub, complaining of hurts to his back and head; that she assisted him from the bathroom; that he was nervous, restless, and white during that night (Sunday), went to his office the following day; was relieved by witness about 10 o'clock in the morning; Monday night drank simply a glass of milk; rested fairly well Monday night, and, after eating some breakfast, went to the store Tuesday morning, and as usual witness relieved him about 10 or 11 o'clock; that she could tell from his looks he was not well; Tuesday night he ate a soft-boiled egg, immediately became violently ill; after drinking some Pluto water, complained of pains in his stomach and vomited; ate some breakfast Wednesday morning, went to his place of business, was relieved by witness as usual early in the forenoon, and at this time deceased was pale, hot, his shirt was wet, and he was doubled over a chair, and she took him home about 2 o'clock. He seemed to get easy after being put to bed, but a doctor was immediately called (Dr. Lee), who advised that assured be taken to the Saint Paul Hospital, where he was at once operated upon by Drs. Lott and Lee. Witness observed a blue spot the size of her fist on her husband's body at the end of his spine on the lower part of his back. She testified further to the effect that her husband was in good health prior to the fall, and had not complained of pain before the injury; that he had occasional spells of indigestion, for which he took soda, and frequently took medicine for constipation; that Dr. Hardin saw her husband at the store about noon Wednesday, at which time insured was complaining of pains in his abdomen.

Two witnesses, George Kucera and J. V. Danna, testified subtantially that they were present in the building at the time Mr. McVeigh fell, heard the noise of the fall, and Kucera testified that Mr. McVeigh, coming from the bathroom into the hall, had his hand on his side, and said he had injured it in the fall, and had hurt the back of his head. Witness saw McVeigh at breakfast, and on the street car the following morning (Monday); he moved slowly, did not sit down in the street car, but held to a strap; that night (Monday) he did not get around any better, on Wednesday moved with even more care than theretofore; and that before being injured deceased had the appearance of being in very good health.

The above, in substance, is all the testimony of the lay or nonexpert witnesses, which, without reference to any other evidence, we think strongly tends to show that the death of the insured resulted from bodily injuries affected directly, independently, and exclusively of all other causes through means of the accidental fall.

Plaintiff also placed on the stand four doctors. Dr. Lee testified that he was called to see Mr. McVeigh the day (Wednesday afternoon) he was taken to the sanitarium; that assured was a very sick man, peritonitis having developed far enough to be decidedly evidenced; that an appendectomy was performed by Dr. Lott, assisted by Dr. Lee; that two or three days after the operation witness observed a bruised area on McVeigh's back over his sacrum, two or three inches in diameter; that his appendix was found to be ruptured near the base, and had some feces, little fragments of fecal matter that had become hardened and stonelike. Based substantially upon plaintiff's evidence as to the fall, injuries, etc., witness was asked a hypothetical question as to whether or not, in his opinion, the fall could probably have produced the ruptured appendix; answered, "It is possible that it could have had something to do with it." Asked further, "Could that reasonably have produced the condition found"? answered, "It would be hard to say that; that would have to be qualified in saying that it 'reasonably could', because those things are decidedly involved—the only way I could answer that, is to say, it would be possible for it to have something to do with it." Again, the witness answered, "I said there could possibly be a connection." Referring to the periodical attacks of indigestion that insured had before being injured, witness was asked whether or not there was any reasonable connection between the fall and the ruptured appendix under those circumstances, answered, "Well, there would be a connection between a period of indigestion preceding his injury and the presence of the fecalith matter in his appendix," explaining that the presence of the fecalith meant to the witness that the insured had a little chronic inflammation and that the fall would impose enough pressure to aggravate that condition. Asked to explain how the pressure of a man's falling on his back could strike and affect his appendix, answered, the only way you could produce any trauma to the appendix

would be the fact that the fluid in the intestinal tract would receive some force from this fall and the force on the fluid would be exerted against the appendix, and that the same amount of pressure would be produced over all of the inside of the man's body; that under such circumstances an appendix can rupture in a period of a very few hours, or can go for several days, depending entirely upon the type of the organism and the type of the appendix. Asked whether or not there was a chronic condition existing with reference to Mr. McVeigh's appendix, the witness said, "Fecalith is usually present in an appendix that is chronic, that has some chronic infection, and that is a diseased part." The witness testified further that McVeigh had no bruise of any kind on his abdomen, and that, in view of the presence of the fecalith, he probably had some chronic infection. Asked with reference to the effect of the fall, the witness answered that all he could say was that there could have been some connection between the ruptured appendix and the fall; that it was not unusual to find a rupture with fecalith, and that a strong purgative, such as Pluto water, would aggravate the infection.

Dr. John L. Goforth, pathologist at Saint Paul's Hospital, examined the appendix after it was removed, testifying from a memorandum made at the time, said "that the appendix was acutely inflamed, the entire organ was inflamed, that near the tip of the organ there was present near or in the lumen, or the canal of the appendix, a fecalith; that the wall of the appendix in that part was gangrenous and a rupture had occurred, the diagnosis being acute suppurated appendix, which was gangrenous, with perforations." Based upon the history of the case, including the circumstance of the fall on the tile floor, witness was asked his opinion as to whether or not there was any reasonable connection between the fall and the condition of the appendix as he found it; answered, "It is very difficult to answer that question without stating first some physical assumptions or some physical qualifications which would make an answer possible." Then asked, if he might answer the question on that basis, the question being repeated, answered, "I think there could be," stating that the condition of the appendix revealed the presence of fecalith in the canal, which undoubtedly had been there for sometime. If the appendix was not inflamed at the time the patient fell, the fall, in his opinion, would do that, not directly—that is, the fall would not transfer injury from the outside directly to the appendix—but indirectly, a fall would "very definitely increase momentarily the intra-abdominal pressure and that would result in somewhat of a squeeze of all of the abdominal organs in which the appendix would participate; that might initiate an infection in the appendix wall, at the site of the fecalith in the event the appendix was already inflamed at the time of the fall"; that it would very definitely aggravate the condition; that, in his opinion, the fecalith was directly responsible for the perforations of the appendix; that an appendix in that condition cannot be regarded as normal. Asked "if McVeigh had not had any pain in the region of his appendix before the fall, what would be his opinion as to whether or not fecalith was existent prior to the injury," answered, "I would conclude that the fecalith was there prior to injury regardless of whether or not he had pain, because it takes a considerable length of time for a fecalith to form"; did not think it could form in two or three or four days, but would take about six months; that, when an appendix becomes inflamed, rupture can ensue within as short a period as twelve hours or as long a period as four or five or six days, the average being from four to five days; that on examining the appendix he found no evidence of trauma.

Dr. W. A. Stiles, who never saw deceased either dead or alive, was asked a hypothetical question, based upon the facts of the case, as follows: "I will ask you to state, Doctor, whether or not, in your opinion, there is any reasonable connection between the fall that I have just described to you and the ruptured appendix?" answered, "I think there could be a connection between the fall and the ruptured appendix, I will put it that way." He further said that, "Due to the increased abdominal pressure, which apparently was a pathological appendix, I think the thing could have caused increased pressure which could have caused the rupture." He further stated, "I should think the rupture would have taken place immediately, when he fell, if the appendix was diseased and about to rupture," and further, "The fall could have aggravated the inflammation in the appendix due to the fecalith being there—pressure might have."

Dr. Fred Wyatt, who never saw deceased living or dead, testified that appendicitis can be brought about by violence or trauma. Based upon the facts, the doctor was asked the hypothetical question whether or not the fecalith concretion which was found in the appendix could have gotten into the appendix by the fall, answered that it could, and testified further that appendicitis is an inflammation or infection in the appendix, followed by pain.

Asked how violence could effect the appendix, answered, "Well, that applies to any part of the intestinal tract. You can get a severe mashing on the abdominal walls which can injure the gut or you can get a twisting of the appendix or any of the guts where they twist on themselves and the blood supply is cut off, either gradually or suddenly, and when that is cut off the intestinal wall dies within a few hours or within a few days, depending on how gradual that supply is cut off, and that the intestinal wall breaks down just like an inner tube, and when it does, it sets up an inflammation which develops into peritonitis; or, if you have had a fall from a height or a fall where the abdominal content is suddenly thrown down it can tear the ligaments that hold up that part and cause it to become in a crooked or careened position, and if it is twisted of itself that wall can be broken down and ruptured."

The witness stated his reasons for the conclusion as follows: "Well, the opening of the appendix is into the gut proper and it contains the fecal matter. It would probably work in and out, the facalith, but whenever you get a sufficient fall where it increased the amount of pressure in the abdominal cavity, and especially inside the gut, it pushes the body front and causes the sudden jerk, everything would go down to the lower levels of the intestines. You might compare it to a tube that has an outlet and taking a portion and push it down, whatever is in it is going to go into that outlet, if it is small enough. I don't see why, because of the force of that fall, you couldn't push that fecal matter into the appendix, as to concretions that is thrown off from the lining of the intestines and the calcium makes it hard—I don't know the size of it, but it is possible to get in there."

Asked as to the reasonable effect that might be expected to McVeigh's stomach from the fall, answered, "All I can state is what may be possible to happen and any type of a fall severe enough to jerk a man's feet from him and let him down suddenly; you may have a telescoping of one gut on another or you may have a twisting of one gut on another which will cause a strangulation or cutting off of circulation. You may have a hernia or a rupture. You may have a twisting or kinking of the gut. Anything may happen if it happens to get the intestinal organs in that condition, or you may get it with any of those conditions."

■ The foregoing lay and expert evidence tends to show that, prior to being injured by the fall, Mr. McVeigh was in good health, as that term is known to the law of insurance, but that, after the fall and resultant injuries, was never well, dying a few days later. The description of the fall bespeaks its own severity and the probable resultant injuries to the body. Peritonitis was very much in evidence on the third day after the fall, was so threatening as to require an immediate operation, which disclosed a ruptured appendix. The peritoneum is the membrane lining the abdominal cavity, investing its viscera, and peritonitis is an inflammation of the peritoneum, either acute or chronic and either local or general in nature. The evidence, we think, suggests the probability that Mr. McVeigh's viscera was sufficiently involved as to produce acute peritonitis of a general nature, although the most prominent manifestation was the injured appendix.

Defendant, in our opinion, unduly narrows the case by treating the injury resulting from the fall as simply an appendix involvement. Both pleadings and proof present the probability of the existence of a more extended injury involving the entire visceral cavity. Plaintiff alleged that the deceased sustained injuries to his abdomen, organs of his abdominal cavity, and to his spine. One of the experts gave testimony to the effect that such a fall would increase the intraabdominal pressure and result in a squeeze of all abdominal organs, in which the appendix would participate. Speaking of the fall, another said that one could get a twisting of the appendix or any of the guts and that, when they twist and the blood supply is cut off, either gradually or suddenly, the intestinal wall would die within a few hours or days, depending on how gradually the blood supply was cut off, and that inflammation would set up, developing peritonitis. Another expert said that the only way to pro-

duce trauma to the appendix would be from the force the fluid in the intestinal tract would receive from the fall, and that such force would be exerted against the appendix, and that the same amount of pressure would be produced over all the inside of the man's body; that the appendix would not have to be ruptured immediately, but could occur in a few hours or days, depending entirely upon the type of the organism and type of the appendix.

Doubtless, few people are immune from pre-existing tendencies or incipient disease that remain quiescent and dormant until aroused by a physical injury or shock, lowering resistence, and when thus aroused, may contribute more or less to suffering or a fatal termination, yet fall far short of being either the sole or a materially contributing cause of the suffering or death.

Upon the whole, we think the evidence raised the issue, and would have justified the jury in finding that the death of Mr. McVeigh was effected directly, independently, and exclusively of all other causes through accidental means, within the terms of the policy, fairly and reasonably interpreted. Therefore hold that the court below erred in directing a verdict for defendant and in rendering judgment accordingly; hence reverse the judgment and remand the cause for further proceedings.

Reversed and remanded.

BOND, Justice (dissenting).

The principal question to be decided on this appeal and on which I register my dissent is whether or not there was any evidence or any sufficient evidence to warrant a submission to a jury of appellant's claim that her husband's death was caused by traumatic appendicitis effected solely by accidental means.

Appellant alleged that "on or about, Sunday night, April 17, 1932, while at his said home taking a shower-bath in the bath-tub, and, while standing in the bath-tub, the said Townsend A. McVeigh, now deceased, accidentally slipped and fell from the bath-tub with great force and violence to the tile floor below, striking the floor with his head, back, and abdomen, and did then and there injure and rupture his appendix, severely damaging, aggravating, and injuring his appendix, causing the same to repture and burst, which, in turn, produced in the said Townsend A. McVeigh's body what is know as peritonitis."

The theory on which appellant based her suit and carried forward in her brief was narrowed to traumatic appendicitis, caused solely by accidental means. I conceive it to be the duty of courts to meet the issue advanced by the parties and not theorized on issues not raised by pleadings or evidence. It is not for courts to advance a new theory of their own. If traumatic appendicitis, effected by the fall, was not the sole cause of the peritonitis resulting in the death of appellant's husband, then, manifestly, there was no other injury shown by pleadings or proof to have caused such condition.

The evidence, I think, is insufficient to raise any issue to be submitted to a jury effecting the death of Townsend A. McVeigh as caused by accidental means. At most, it shows only a possibility that there might have been, or could have been, some connection between the fall and the condition which caused the death. Each of the doctors expressly declined to state, after repeatedly asked by appellant, that there was any reasonable probability that the trouble was caused by the fall; evidently the technical subject was beyond the knowledge of the lay witnesses. Indeed, Dr. Lott, who performed the operation, and Dr. Lee who assisted him in the operation, furnished evidence, reflected in the record, that there was no connection whatever between the fall and the condition of the deceased; that there was no trauma resulting from the fall; and that he died as a result of chronic appendicitis. The only evidence of the fall shown on the outside or inside of the body was a bruised place on his back. It is inconceivable to a layman's mind how a fall and injury to one's back could produce appendicitis, the appendix being located in front of the human body. The doctors who were in a position to know, and whose testimony was offered in evidence by appellant, did not venture a theory of even a probability that such condition resulted from the fall; the most they did say was a suspicion or surmise in the realm of possibility, that it could have done so.

It is well settled in this state that evidence which merely raised a suspicion or surmise of the fact sought to be proved is, in contemplation of law, no evidence. The fact that the deceased was in apparently good health before the fall and thereafter suffered from appendicitis, resulting in his death, is insufficient to support a verdict or judgment based thereon,

or to justify submission of an issue as to whether or not the death of Townsend A. McVeigh was caused by accidental means.

Appendicitis is, as known to all men, an insidious inflammation of the vermiform appendix of the human race, and, because a healthy, robust man or woman is suddenly afflicted with that condition, raises no evidence of probative force that the condition was caused by an accidental fall, nor does the fact of an accident carry with it a presumption that it produced the condition. It was incumbent upon appellant to show that the fall did produce the condition, or such facts that ordinary minds would not differ as to the conclusion to be drawn from such evidence.

The Supreme Court of this state, in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, said: "From a careful examination of the cases, it appears (1) that it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force. If it so determines, the law presumes that the jury could not 'reasonably infer the existence of the alleged fact,' and 'that there is no room for ordinary minds to differ as to the conclusion to be drawn from it.' The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining as a question of law whether the testimony establishes more."

To the same effect, is the case of Garrett v. Hunt (Tex.Com.App.) 283 S.W. 489, 491:

"'It is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the fact sought to be established.'

"For in such a case the law presumes that the jury could not reasonably infer the existence of the alleged fact, and that there is no room for ordinary minds to differ as to the conclusion to be drawn from such evidence."

In the case of E. M. Patton v. Texas & P. Ry. Co., 179 U.S. 658, 21 S.Ct. 275, 277, 45 L.Ed. 361, the principle here urged was stated in that case by the United States Supreme Court, as follows: "The fact of accident carries with it no presumption of negligence on the part of the employer; and it is an affirmative fact for the injured employee to establish that the employer has been guilty of negligence. * * * It is not sufficient for the employee to show that the employer may have been guilty of negligence; the evidence must point to the fact that he was. * * * And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion. If the employee is unable to adduce sufficient evidence to show negligence on the part of the employer, it is only one of the many cases in which the plaintiff fails in his testimony; and no mere sympathy for the unfortunate victim of an accident justifies any departure from settled rules of proof resting upon all plaintiffs." See, also, Langford v. El Paso Baking Co. (Tex. Civ.App.) 1 S.W.(2d) 476; Waco Drug Co. v. Hensley et al. (Tex.Com.App.) 34 S.W.(2d) 832; Seybold v. Johnson, et al. (Tex.Civ.App.) 11 S.W.(2d) 399; Grand Temple and Tabernacle in State of Texas of Knights and Daughters of Tabor of International Order of Twelve et al. v. Independent Order of Knights and Daughters of Tabor of America et al. (Tex.Com.App.) 44 S.W.(2d) 973; Teal v. Southern Pacific Ry. Co. et al. (Tex. Civ.App.) 31 S.W.(2d) 337; Richards v. H. K. Mulford Co. (C.C.A.) 236 F. 677; Copeland v. Hines (C.C.A.) 269 F. 361; Ft. Worth & R. G. Ry. Co. v. McMurray (Tex.Civ.App.) 173 S.W. 929.

It will serve no useful purpose to extend my views on the controlling question, and, without further discussion of the issue, I find myself unable to agree to the reversal of this cause; it should be affirmed; thus my dissent.

## On Rehearing.

LOONEY, Justice.

In the original opinion, we discussed the question of variance presented and, for reasons stated, held that no variance existed, and in this connection said that, because of certain admissions made in its pleadings, defendant in error was in no position to deny that the policy sued upon was its contract; calling attention to two places in its answer admitting its assumption of the contract, first in a special exception, and again in a special plea, seeking to avoid payment of attorney fees, alleging specifically that, while the policy was issued by International Travelers Assurance Company, defendant in error had reinsured the risk, "assumed and bound itself to pay and discharge all liability of the International Travelers Assurance Company under the policy attempted to be sued upon, and/or any other policy written by the International Travelers Association."

In its motion for rehearing, defendant in error calls our attention to the fact that it filed an amended answer, on which the trial was had, omitting the special exception referred to; hence we are requested to so state and show that the admission, if it be an admission, was made only in its amended answer. We make the correction, but think it clear that in its amended answer such an admission was made as to obviate the necessity of further proof on the issue—that is, an admission that the contract sued upon had been assumed by it.

Referring to the testimony of Mrs. McVeigh, we stated that, "She testified further, to the effect that, her husband was in good health prior to the fall." Defendant in error objects to this statement, because not warranted by the facts. The excerpt quoted and objected to is not all that was stated in that connection; we said, "She (Mrs. McVeigh) testified further, to the effect, that her husband was in good health prior to the fall and had not complained of pain before the injury; that he had occasional spells of indigestion, for which he took soda, and frequently took medicine for constipation." After stating the testimony at length, we also stated on this point that, "The foregoing lay and expert evidence tends to show that, prior to being injured by the fall, McVeigh was in good health as that term is known to the law of insurance, but that, after the fall and resultant injuries was never well, dying a few days later."

■ It is not every ailment, indisposition, or imperfection that renders one of unsound health. There must be a material departure from sound health and, whether this is true or not is a question of fact to be determined by the jury, and not one of law to be determined by the court. In the instant case, the only afflictions this man had prior to the accident were indigestion for which he took soda, and constipation for which he took laxatives, generally considered common, and ordinarily negligible, afflictions of mankind; the only other indication that this man was not in sound health was the fact that, after the accident, the operation disclosed a ruptured appendix. However, there is testimony tending to show that the violent condition of the appendix could have arisen between the time of the fall and operation, there being no evidence that he (Mr. McVeigh) had suffered any pain, indicative of an appendix trouble prior to the fall, or that, if it existed at all, that it was dormant and inactive. See Hines v. New England Casualty Co., 172 N.C. 225, 90 S.E. 131, L.R.A.1917B, 744, and annotations at pages 747, 749.

We also stated in the majority opinion that Dr. Lee, assisted by Dr. Lott, operated upon Mr. McVeigh for appendicitis. The record discloses that the converse is true.—that is, Dr. Lott operated, assisted by Dr. Lee. Defendant in error deems a correction of this matter material, and accordingly the same is made.

At page 5 of our opinion, 101 S.W.(2d) 646, propounding the question about to be considered, among other things, we said, "Did it [meaning the evidence] raise more than a mere surmise, suspicion, or probability that the death of Townsend A. McVeigh resulted," etc. Inadvertently, we used the word "probability" instead of "possibility," and, our attention being called to the matter in the motion for rehearing, the opinion will be corrected accordingly.

The trial court having instructed a verdict for defendant in error, in order to properly determine the correctness, whether or not, of such action, necessarily, we had to review the testimony of witnesses; quoting at places the language used and at other places stating our conclusion as

to the substance and meaning of the testimony. In the motion for rehearing, counsel for defendant in error say, "At page eight of the majority opinion [101 S.W. (2d) 647], it is stated that the witness, Dr. Lee, testified that the fall would impose enough pressure to aggravate that condition (referring to the chronic inflammation of the appendix)." Objection is urged to the above statement, counsel for defendant in error say that, "In fact, the witness testified: Q. Alright, what reasonable effect would such a fall have upon this? A. If enough pressure would be set up, it is possible that it could aggravate it." The objection is that, "Manifestly, the statement in the majority opinion is not warranted by the witness' testimony, the witness not having testified that the fall would impose enough pressure to aggravate that condition, * * * but that it is possible that it could have aggravated it," therefore, we are requested to withdraw the statement.

Dr. Lee was asked quite a number of questions and gave answers of different shades of meaning, as to the effect the fall would likely have upon the appendix, in view, as the witness testified, of the probability that there existed a "little chronic inflammation," due to the presence of the fecalith in the appendix, and, in addition to questions and answers of the witness, quoted in the motion for rehearing, he was asked:

"I wish you would explain to the court and jury how pressure of a man's falling on his back could strike and affect his appendix? A. The only way you could produce any trauma to the appendix would be the fact that the fluid in the intestinal tract would receive some force from this fall, and the force on the fluid would be exerted against the appendix.

"Q. Well, I will ask you to state whether or not that is a natural thing to expect a fall of that character, whether or not you would naturally expect pressure to be produced on the right side of a man's body? A. Well, you would expect the same amount of pressure to be produced over all the inside of that man's body."

Construing the testimony of this witness most favorably to plaintiff in error, we think the statement we made was warranted, therefore will not be withdrawn.

In this same connection, and following immediately, Dr. Lee was asked:

"Q. Doctor, state whether or not, please, the appendix would have to be ruptured immediately after such fall? A. I don't think it would.

"Q. How long does it usually take for an appendix to rupture following such an occasion?"

At this juncture, there were several objections and rulings, after which the question was repeated, as follows:

"Q. Well, an appendix such as this one you saw out there in Mr. McVeigh's body, I will ask you to state whether or not that was a ruptured appendix when you saw it? A. It was.

"Q. How long would you reasonably expect it to take for such an appendix to rupture? What is the length of time it would take? A. An appendix can rupture in a period of a very few hours, or it can go for several days, depending entirely upon the type of organism and the type of appendix you have."

With reference to this phase of Dr. Lee's testimony, we quoted him as saying, in substance that, "Under such circumstances, (the circumstances in regard to which the witness had just been interrogated), an appendix can rupture in a period of a very few hours or can go for several days, depending entirely upon the type of appendix." Counsel for defendant in error criticizes our statement, saying that, "Clearly, there is no justification for the court's saying that 'under such circumstances' the witness testified that the appendix can rupture, etc. The witness' answer, as clearly shown by the statement of facts, was an abstract comment, and was not connected with any set of circumstances. The use of the phrase 'under such circumstances' is therefore misleading and not in accordance with the facts, as shown by the statement of facts * * *"; therefore request is made that the statement objected to be withdrawn.

We think it perfectly obvious that the testimony of Dr. Lee referred to the case at hand, and not to an imagined or hypothetical case, was not an abstract comment, but connected directly and immediately with the facts and circumstances in regard to which the witness had just been interrogated; hence the statement being authorized will be permitted to stand.

Dr. Goforth, having testified as to the ruptured condition of the appendix after its removal, was asked a lengthy hypothet-

ical question and, after many objections and rulings, answered that, in his opinion, there could be a reasonable connection between the fall and the condition of the appendix as he found it (stating his reasons, appearing later). We quoted Dr. Goforth as testifying to the effect that, if the appendix was not inflamed at the time the patient fell, the fall, in his opinion, would do that, not directly—that is, the fall would not transfer injury from the outside directly to the appendix, etc. Objection to our statement, counsel for defendant in error sets out the testimony of the witness, as follows: "In the event that the appendix was not inflamed at the time the patient fell, the fall, according to my opinion, could do that, I don't believe that the fall could directly—I mean by the word 'directly,' I don't believe that the fall could transfer injury from the outside directly to the appendix. * * *" The quotation ends in the middle of the sentence; completing it, the witness said, "but indirectly a fall would, at the time of the fall, I think, very definitely increase materially the intra-abdominal pressure, and that would result in somewhat of a squeeze of all of the abdominal organs in which the appendix would participate; that might initiate an infection in the appendix wall * * * at the site of the fecalith, in the event the appendix was already inflamed at the time of the fall. I think such fall would very definitely aggravate the condition." Considering the testimony of this witness as a whole, and giving to it a construction favorable to plaintiff in error, we do not think we misstated the meaning and effect of the testimony; therefore will permit the language to remain as written.

In the course of the majority opinion, we said, "Defendant, in our opinion, unduly narrows the case by treating the injury resulting from the fall as simply an appendix involvement. Both pleadings and proof present the probability of the existence of a more extended injury involving the entire visceral cavity." We then set out pertinent portions of the pleadings and a lengthy statement of the evidence, reaching the conclusion that, upon the whole, the evidence raised an issue that would have justified the jury in finding that the death of Mr. McVeigh was affected directly, independently, and exclusively of all other causes through accidental means, within the terms of the policy fairly and reasonably construed.

Counsel for defendant in error say that, throughout the trial below, plaintiff in error made an effort to show that her husband sustained traumatic injury to his appendix, resulting in peritonitis, and, that there was not the least suggestion by any witness that peritonitis was probably caused by some injury to the peritoneum, other than to the appendix; then counsel say, "How this court can say that the evidence suggests the probability that McVeigh's viscera was sufficiently involved as to produce acute peritonitis of a general nature" was beyond their comprehension, charging the majority with theorizing on issues not raised by evidence.

It is obvious, we think, that counsel for both parties paramounted the theory that the injury causing McVeigh's death was simply an appendix involvement, but, as before stated, we think both pleading and evidence not only justified that theory, but also presented a larger question, certainly in view of the evidence tending to show that, prior to the fall (aside from attacks of indigestion and constipation, for which simple remedies were taken), McVeigh was in good health, that no other affliction had manifested itself, indicating that, even if his appendix was at the time inflamed, due to the probable presence of the fecalith, the inflammation was not violent but in a dormant condition.

Certainly, counsel do not insist that this court, in reviewing the action of the trial court, is manacled to an erroneous view or theory of the case that caused the rendition of an erroneous judgment. It is quite true that we found from facts another theory, but in doing so we were not theorizing merely—that is, groping outside the record for a theory, as the criticism of counsel would imply—but theorizing within the domain of both pleading and proof. The question presented to us was not whether the theory held by counsel for either party or the trial court was correct, but whether there was evidence legally sufficient to have carried the case to the jury on the decisive issue—that is, whether the death of McVeigh was affected directly, independently, and exclusively of all other causes, through means of the accidental fall, and not simply whether peritonitis resulted from a ruptured appendix.

Speaking of the combined effect of accident and disease, the doctrine is stated in 1 C.J. 452, 453, § 127 (c), that,

"The exception operates to relieve the insurer from liability where the injury and an existing bodily infirmity concur and co-operate to produce the disability or death; but the tendency of the courts, under the settled rules of construction applicable to insurance contracts, is to interpret the clause in a manner favorable to the insured, and the insurer is accordingly held liable where the accident can be considered as the proximate cause of death, although disease may have been present as a secondary cause, or where the death is the reasonable and natural consequence of the injury, although disease may have supervened, or where the accident is the true cause of death or injury and the disease but the occasion. So also if death results from the accident, the fact that but for weakness or infirmities produced by former illness or disease it would not have been fatal will not prevent a recovery." Also see Ætna Life Ins. Co. v. Hicks, 23 Tex.Civ.App. 74, 56 S.W. 87 (writ denied).

We think the case should have been submitted to the jury under the doctrine just quoted, and, seeing no reason to change our decision, defendant in error's motion for rehearing is overruled.

Overruled.

BOND, J., dissents.