**MUTUAL BENEFIT HEALTH AND ACCI-
DENT ASSOCIATION, Appellant,**

**v.**

**Mary Louise HUDMAN, Appellee.**

**No. 11245.**

Court of Civil Appeals of Texas.

Austin.

Dec. 16, 1964.

Rehearing Denied Jan. 6, 1965.

San Angelo, Texas. This suit is by his widow, Mary Louise Hudman, against Mutual Benefit Health and Accident Association to recover, as named beneficiary, on an insurance policy issued by the Association to Mr. Hudman which provided, in part:

"The applicable benefit amount * * will be paid to the beneficiary named * * * if covered injuries result in your death independently of other causes * * * 'Covered injuries' means accidental bodily injuries which you receive while you are driving or riding in any private passenger automobile * * *"

Trial was to the court without the aid of a jury. Judgment was rendered for appellee in the principal policy sum of $2000.00, with 6% interest from July 27, 1963, (the policy provides for payment within 90 days from the date of insured's death) $240.00 statutory penalty, $500.00 attorney's fees, and contingent attorney's fees of $250.00 if appealed to the Court of Civil Appeals and $250.00 if carried to the Supreme Court.

Upon appellant's request the Trial Judge prepared and filed findings of fact and conclusions of law which we copy:

### "FINDINGS OF FACT

"1. The pickup truck owned by Paul B. Hudman was used by him and his family as a private passenger automobile. It was being so used at the time of his death.

"2. Prior to his death on April 28, 1963, Paul B. Hudman was in apparently good health. He had never had a diagnosis of or treatment for heart trouble of any kind. He had never complained to his wife or friends of chest pain, shortness of breath or other heart symptoms.

"3. Paul B. Hudman died of ventricular fibrillation, which proximately resulted from his unusual and excessive exertions on an abnormally hot day, on

R. F. Proud, Omaha, Neb., Brundidge, Fountain, Elliott & Churchill, Bobby D. Dyess, Dallas, for appellant.

Hardeman, Smith & Foy, San Angelo, for appellee.

HUGHES, Justice.

Paul B. Hudman died April 28, 1963, while driving his 1960 pickup truck near

which there was an extreme fluctuation in humidity. This was an accidental bodily injury and it occurred while he was riding in his pickup truck. The exertion of driving the pickup truck on the ranch road immediately prior to his death was a contributing cause of the fibrillation.

"4. The arteriosclerosis of Hudman's coronary artery was a predisposing condition and not a proximate cause of his death. Of itself, it would not have caused his death.

"5. A reasonable attorney's fee for services rendered in the preparation and trial of plaintiff's case through the trial court is $500.00, with an additional $250.00 if the case is appealed to the Court of Civil Appeals and $250.00 additional to that if an application is made to the Supreme Court for writ of error.

### "CONCLUSIONS OF LAW

"1. Within the meaning of the policy, the vehicle which insured was driving on the occasion in question is a private passenger automobile.

"2. The combination of excessive and unusual exertion, abnormally hot weather and extreme fluctuation in humidity is a sufficient external trauma to constitute the resulting ventricular fibrillation an accidental bodily injury, within the meaning of the policy.

"3. Plaintiff is entitled to judgment for the proceeds of the policy, $2,000.-00, plus interest thereon at the rate of six (6%) percent per annum from July 27, 1963, (ninety (90) days after the death of the insured), together with $240.00 statutory penalty and attorney's fees of $500.00 through the trial court, an additional $250.00 if appeal is made to the Court of Civil Appeals and $250.00 additional to that if application is made to the Supreme Court for writ of error, said attorney's fees to be taxed as cost herein."

There is no controversy regarding the facts and circumstances pertaining to the death of Mr. Hudman. We will briefly recite them.

Mr. Hudman died at the age of 54 years. He was a pharmacist, customarily working in an air conditioned building. He owned some farms near San Angelo on which, on Sundays, he frequently engaged in physical labor. On the Sunday he died, Mr. Hudman went to one of his farms early in the morning and he returned for his fifteen year old son, Gary, about 9:30 a. m. Mr. Hudman was driving his Chevrolet Fleetside one-half ton pickup, manufactured in 1960. It was two wheel drive, equipped with heavy duty coil springs and it had three forward and one reverse gears. It was licensed in Texas as a "farm truck." Attached to this pickup was a trailer, a stock trailer about 14' long, 4' wide, a flat bed without sides, but with wooden uprights in iron holders to contain the hay and feed being carried.

Shortly after leaving home, the trailer had a flat which Mr. Hudman repaired with some difficulty.

Mr. Hudman and his son Gary worked throughout the day until about five p. m., with a short time out for a light lunch. The work consisted of loading and unloading the trailer and truck. Mr. Hudman had sold one of his farms and he was engaged in removing articles from the sold place to his other farms in the vicinity. The articles loaded and unloaded were assorted junk, posts, a sheep trough, wire and concrete blocks. There were about fifty of these blocks weighing 20¾ lbs. each. Some of the posts weighed 50 lbs. each. The sheep trough weighed about 200 lbs.

Mr. Hudman did all the driving. When the loaded trailer was attached he had to drive slowly to prevent whipping. The trailer was detached when the journey home commenced.

About 5 p. m., when enroute home, Mr. Hudman decided to go by the Herring

place and look at a mare he had there for breeding. As he and his son approached the Herring place, Gary noticed his father's hands fall from the steering wheel and he slumped against the seat. Gary took the wheel and guided it to a stop in front of the Herring house. Artificial respiration was applied to no avail. An ambulance was summoned. Mr. Hudman was carried to a San Angelo hospital where he was pronounced dead upon arrival.

It was stipulated that prior to the day of his death Mr. Hudman "had never complained of pain in his chest to his wife, partner or friends; from all external appearances he was in good health; no doctor had ever diagnosed heart trouble or disease or treated him for heart trouble or disease."

The evidence showed that the maximum temperature on the day Mr. Hudman died was 89°, reached at 4-5 p. m., which temperature was 5° above the Weather Bureau's fifteen year average for that date and which was 5° higher than the maximum temperature for any day in the preceding week. The humidity on this day was 90% at 8 a. m. and 6% at 6 p. m.

An autopsy was performed by Dr. Lloyd R. Hershberger, M.D. on the body of Mr. Hudman, Dr. Philip O'B. Thompson, M.D. participating, and it showed that Mr. Hudman had heart disease of the arteriosclerotic type, the testimony being that arteriosclerotic heart disease is a thickening of the coronary arteries that supply the nutrition and oxygen to the heart muscles. The disease manifests itself by a narrowing of the diameter of the coronary arteries so that the total amount of blood flow to the diseased heart is decreased.

When asked to describe the main vessels that were diseased in Mr. Hudman's case, Dr. Hershberger testified as follows:

"The one particularly mentioned in my report relates to the anterior descending branch of the left coronary where there were two different areas of narrowing that were quite significant, but in addition to this there was a general thickening of the coronary circulation that involved both right main coronary and the left main coronary; so I had in my description at least three vessels that showed damage."

About two centimeters below the origin of the left descending coronary Dr. Hershberger found a marked narrowing of the vessel; he stated that the diameter of this vessel was about ⅛th of what would be found in a normal coronary artery. Further down the same artery at about four centimeters from its origin, Dr. Hershberger described a second area of narrowing which he also estimated had reduced the interior space to about ⅛th of the normal size. The diseased artery supplied the blood to the muscles of the heart, particularly to the left ventricle. Because of the narrowing of the artery, Dr. Hershberger stated that the blood supply to that portion of the heart would be reduced to about ⅛th of the adequate supply.

The arteriosclerotic heart disease in Mr. Hudman's case, according to Dr. Hershberger, was substantially more advanced than would normally be found in a fifty-four year old male and Mr. Hudman had been afflicted with the disease for at least five years and possibly longer.

Dr. Hershberger also found an old area of scarring of the myocardium or heart muscle. The scarring was caused by arteriosclerosis, and a small blood vessel of the heart had become occluded so as to block off the blood supply to that particular area of the heart. The scarring had taken place at least six months previous to death.

Dr. Philip O'B. Montgomery, M.D., a witness for appellee, in response to an extremely long hypothetical question embracing most of the relevant facts as to which there was evidence and inquiring as to the cause of death of Mr. Hudman answered as follows:

"A. In my opinion, his death was caused by ventricular fibrillation, and

the cause of the ventricular fibrillation was the unusual amount of work that he did under the emotional pressure that he did it, on a day when the temperature was unseasonably hot, and the humidity showed an extraordinary variation.

"These factors, coupled with his coronary arteriosclerotic disease, caused his heart to fibrillate, and this was the immediate cause of his death.

"Q. What is meant by ventricular fibrillation?

"A. Ventricular fibrillation is a very abnormal and almost always fatal rhythm of the heart in which the heart beats extremely rapidly and very ineffectively, and it usually lasts only a few moments until the individual dies very suddenly.

"Q. Are you telling us then that the exertion in which he was engaged deprived the heart muscle of oxygen or blood supply, and that it was irritated and went into this rapid shallow and ineffectual beating?

"A. I am saying that he had decreased blood supply to his heart, that he had an increased demand for blood to his heart because of unusual physical, emotional and weather conditions, and that the impinging of these two things caused his heart to fibrillate.

"Q. Did the continued exertion, driving this pickup, contribute, in your opinion, to the onset of the fibrillation?

"A. I am sure it did.

"Q. Maybe I better ask this. State the facts with regard to whether the continued exertion of driving the pickup had any contributory bearing upon his going into fibrillation?

"A. I would say that it did."

The first three points made by appellant, jointly briefed, are that the trial court erred in finding and concluding that the pickup truck being driven by Mr. Hudman at the time of his death was a "private passenger automobile" within the terms of the policy in suit. This finding is attacked as being unsupported by any evidence and as being against the great weight and preponderance of the evidence.

In addition to the facts stated above Mrs. Hudman testified that she and her husband owned, in addition to the pickup, a 1963 Plymouth Belvedere. With reference to the pickup, she testified that it was customarily used for, "Transportation of persons and belongings of the Hudman family."

Art. 6675a–1, Vernon's Ann.Tex.Civ.St., contained in Title 116, Ch. I, 2, Regulation of Vehicles, defines a "Passenger Car" as meaning "any motor vehicle other than a motor cycle or a bus, as defined in this Act, designed or used primarily for the transportation of persons."

■ Because this statute was enacted in a different context from insurance we do not consider it conclusive upon the question here presented. We do, however, accept its persuasive value.

There do not appear to be any Texas cases in point upon the question presented. The case of Pennell v. United Insurance Company, 150 Tex. 541, 243 S.W.2d 572, is cited by appellant as furnishing a guide to the proper solution. The phrase there construed by the Court as applied to a jeep was, "while driving or riding within any private passenger automobile exclusively of the pleasure car type." The Court, four Justices dissenting, held that a jeep was not "exclusively" a pleasure type car. The Court utilized the word "exclusively" to refute the contention that the policy covered passenger cars used both for pleasure and hauling freight. If the word "exclusively" restricted the present descriptive policy words "private passenger automobile" we would have little difficulty in reaching a decision.

Appellant also cites Taft v. Maryland Casualty Company, 211 N.C. 507, 191 S.E. 10. In that case a 1934 Ford V–8 truck was held not to be a "passenger automobile." The Court there cited and distinguished the case of Fidelity and Casualty Co. v. Martin, 66 F.2d 438, 9th Circuit, saying, "In the Martin case, * * * the factual situation was different. 'Roy Anderson, a Ford salesman, testified that the car purchased by Mr. Martin was a Ford roadster, pick-up body, and not a truck.'" The pertinent language of the policy in the Martin case was, "While riding in a private passenger automobile." The Court held that an issue of fact was presented as to whether the pickup was a passenger automobile.

In Aetna Life Ins. Co. of Hartford v. Bidwell, 192 Tenn. 627, 241 S.W.2d 596, it was held that a half-ton pickup truck was a passenger automobile as a matter of law under the policy there sued on.

We insert below a picture of the Hudman pickup.

■ It is our opinion that this car, pictured above, is from its appearance, from the evidence, and from our source of common knowledge [1] upon which we are authorized to draw, an automobile designed and used for the dual purpose of transporting passengers and goods.

■ If appellant had intended to limit its coverage to cars designed exclusively for the transportation of passengers it was, in our opinion, incumbent upon it to so write its policy. Not having done so, we hold that this pickup is a "passenger automobile" within the meaning of the policy in suit.

1. Aetna Life Ins. Co. of Hartford v. Bidwell, supra.

We have considered only the evidence most favorable to appellee in overruling appellant's no evidence points and have considered all the evidence in overruling its point that the finding of the Court in question is against the overwhelming weight and preponderance of the evidence.

Points four and five, jointly briefed, are that there was no evidence to support the finding that the arteriosclerotic heart disease suffered by Mr. Hudman was merely a predisposing condition and not a proximate cause of his death, and that this finding was so against the weight and preponderance of the evidence as to be manifestly unfair and unjust.

We have set out some of the medical testimony bearing on the cause of death of Mr. Hudman. We wish to add the following:

Dr. Hershberger testified that the heart disease of Mr. Hudman was considered by him to be "a contributing cause of death." He testified that the hardening of the coronary vessels was very significant and a contributing cause of death, and that the primary cause of Mr. Hudman's death was a combination of pre-existing heart disease and the physical exercise performed on the day of his death. When asked to state which of these causes was the primary cause of death, Dr. Hershberger replied, "No, I prefer to consider them equal."

Dr. John L. Goforth testified as an expert and in answer to hypothetical questions. Dr. Goforth testified that in his opinion Mr. Hudman had heart trouble on the day of his death and that he had had heart trouble for some time, such heart trouble being due to the existence of an "arteriosclerotic process" which had been progressive over a period of time. This process had over a period of time reduced the luminal diameter of the major blood vessels that carry nutriment to the heart muscle. Dr. Goforth stated that when the diameter of the vessel lumen or bore had been reduced to ⅛th of its normal diameter there would be insufficient blood passing

through the vessel to feed the heart muscle. In Dr. Goforth's opinion the diseased condition described in Dr. Hershberger's autopsy report could have caused the death of an individual in and of itself; this disease process very frequently sooner or later causes sudden death.

According to Dr. Goforth, in the absence of the existing heart disease Mr. Hudman's death would very probably not have taken place.

Summing up, Dr. Goforth stated:

"This man had a disease process which was slowly progressive, and in my reading this report and interpreting the findings, I would have to say very frankly, that I do not see any evidence of bodily injury entering the picture here at all.

"I would have to say that this was a natural disease process which followed a course not at all unnatural, and that relatively sudden death occurred during a period of relaxation on his way home."

On cross-examination Dr. Goforth testified that the heart disease which Mr. Hudman suffered from is a progressive disease which continuously narrows the bore of the vessels, all the while cutting down the amount of blood that goes through to nourish the muscle, and there comes a time when insufficient blood goes through or when no blood goes through. The doctor indicated that this is not something which happens to all of us at some time because of the aging process; but to the contrary, was a disease process which was very extensive in the three major blood vessels that fed Mr. Hudman's heart. He stated, "this degree of arteriosclerosis occurring, in my opinion, speaks immenent to serious trouble."

Dr. Montgomery, whose testimony for appellee has been heretofore noted, was asked on cross-examination, "Did you feel from your examination and from the facts as stated by Mr. Foy that the pre-existing

disease and this situation of exertion and stress and temperature were equally contributing factors in this man's death? A. Well, I don't know whether you could take one of these factors away and say if you withdraw this factor would he have still died, because he did die, and all these factors were present, and in my opinion, they all have a direct relationship."

Dr. Montgomery stated that if Mr. Hudman had had a perfectly normal heart it would have been unlikely that he would have died.

Finally, Dr. Montgomery was asked on cross-examination, "But then, basically, your opinion is that all these physical stress factors, as well as the disease, were a combined cause of this man's death? A. Correct."

We quote from appellant's brief:

"The language of the policy rider here sued upon provides for recovery where covered injuries result in death 'independently of other causes.' The testimony of the three medical witnesses, previously summarized, establishes that death did not result from physical exertion alone but that the pre-existing arteriosclerotic heart disease was a primary contributing cause of death, equally as important as the physical exercise which Mr. Hudman engaged in. The rule was established many years ago in Texas that, where the policy provides coverage for accidental injury or injury by accidental means, independently of other causes, no recovery can be had unless the accidental injury alone produced the result."

Dr. Montgomery testified that Mr. Hudman's coronary arteries were narrowed, but not occluded, and that "it was not a disorder which in and of itself would cause his death." He further testified that this is a disease which all males are subject, with increasing age, saying, "Somewhere around the age of thirty we believe is the time when you begin to develop changes which at fifty lead to the sort of changes which he (Mr. Hudman) had. In the age group of Mr. Hudman Dr. Montgomery said "that a good many men would have this amount of coronary" artery disease.

We quote the following testimony of Dr. Montgomery:

"Q. Then state whether, Doctor, ventricular fibrillation in and of itself is a competent producing cause of death in a heart that would otherwise perform satisfactorily its function of sustaining life.

"A. Yes, it is.

"Q. Was that such a cause or mechanism in the case of Mr. Hudman, in your opinion?

"A. Yes, it was.

"Q. In your opinion, then did Mr. Hudman receive, in the medical sense, an injury to his body?

"A. Yes, he did.

"Q. When did that injury occur?

"A. The injury occurred at the time that he was driving the truck and it was observed by his son that he stiffened and refused to respond.

\*    \*    \*    \*    \*    \*

"Q. Did you also say that the arteriosclerotic heart condition was a contributing cause of death?

"A. Yes. I included in Mr. Hudman the fact that Mr. Hudman had coronary arteriosclerosis.

"Q. Yes, and this coronary arteriosclerosis was the main disease or the main condition that he was affected with?

"A. Well, it was his principal anatomical change. The main process which killed him, however, was ventricular fibrillation."

Dr. Hershberger testified that if Mr. Hudman had been in an operating room with competent surgical assistance when he was stricken that he might not have expired.

We believe the rule to be applied here is accurately stated by Chief Justice Bell in Tix v. Employers Casualty Company, 368 S.W.2d 105, Houston C.C.A., no writ history, as follows:

"Where the policy of insurance provides, as does the one here involved, that there is liability only if death is produced by bodily injuries resulting from accident directly and independently of all other causes, we must seek the proximate cause of death. If some other cause was the proximate cause of death and the accidental bodily injuries are merely a remote cause, there cannot be recovery. It is of course settled in this State that the mere fact that a deceased person was ill and was in a weakened condition so that he was more susceptible to effects from bodily injury will not prevent recovery where the efficient cause of death was the bodily injuries. For instance, if a person has a thinner skull than is normal so he is more susceptible to a skull fracture, such fact will not prevent recovery where the skull is fractured. Though he has arteriosclerosis so he is more likely to have a thrombosis than a person without any arteriosclerosis, this alone would not prevent recovery. He may even have some disease, but if such disease is a remote cause of death only there may be recovery if the proximate efficient cause of death is the accidental bodily injury. If a person has influenza so his resistance is low, this fact alone does not prevent recovery. These things of themselves are merely conditions or remote causes but are not, as a rule, the proximate or efficient or immediate cause of death."

This same rule is stated by Texas Supreme Court Chief Justice Calvert in his dissent in Pan American Life Insurance Company v. Andrews, 161 Tex. 391, 340 S.W.2d 787, 798, 93 A.L.R.2d 560, as follows:

"The difficult question is whether the evidence supports the implied finding of the trial court that the cerebral thrombosis was effected solely or directly and independently of all other causes through external, violent and accidental means. In approaching that question it should be noted at the outset that if death is proximately caused by accidental means it is immaterial that a pre-existing condition of health may have made the body more susceptible to injury; death from injury in that situation it is held, nevertheless results 'solely' or 'directly and independently of all other causes' from the injury. Home Benefit Ass'n of Paris v. Smith, Tex.Civ.App., 16 S.W.2d 357, writ refused; 29A Am.Jur. 351, Sec. 1212."

The majority in that case held that an insured who died from a cerebral thrombosis resulting from psychic trauma induced by fright or mental shock caused by watching his office burn 34 days previous did not constitute death in consequence of bodily injuries effected solely through "external, violent and accidental means" as provided in the policy in suit, but the Court did not disturb nor question the above rule as stated by the Chief Justice.

In Pyramid Life Insurance Company v. Alexander, 337 S.W.2d 813, Texarkana C.C.A., 1960, error ref., n. r. e., the trial court submitted to the jury a special issue inquiring whether the death of the insured resulted directly and independently of all other causes from accidental injury. The following instruction was given: "In connection with the foregoing special issue, you are instructed that death resulting from accidental bodily injury directly and independently of all other causes occurs when death is the reasonable and natural consequence of such accidental bodily injury, as the term has been defined, and but for

which, such death would not have occurred. Such death can occur from accidental bodily injury directly and independently of all other causes even though disease may have been present as a secondary cause thereof." The insurance company objected to this definition on the ground that it placed a more onerous burden on it than required by the policies in question. The deceased suffered from nephritis and died as a result of uremic poisoning, due to an injury to his kidney. The doctor who testified for the plaintiff admitted that the nephritis could have been a secondary cause of death. The Court of Civil Appeals held that the instruction was correct and that the evidence supported the jury's affirmative answer to the special issue.

In Alexander the Court quoted from McVeigh v. International Travelers Assurance Company, 101 S.W.2d 644, Dallas C.C.A., 1936, error dism., the following statement originally taken from 1 Corpus Juris 452, 453:

" * * * [T]he tendency of the courts, under the settled rules of construction applicable to insurance contracts, is to interpret the clause in a manner favorable to the insured, and the insurer is accordingly held liable where the accident can be considered as the proximate cause of death, although disease may have been present as a secondary cause, or where the death is the reasonable and natural consequence of the injury, although disease may have supervened, or where the accident is the true cause of death or injury and the disease but the occasion. So also if death results from the accident, the fact that but for weakness or infirmities produced by former illness or disease it would not have been fatal will not prevent a recovery."

The court in McVeigh stated: "Few people are immune from pre-existing tendencies or incipient disease that remained quiescent and dormant until aroused by a physical injury or shock, lowering re-

sistance, and when thus aroused, may contribute more or less to suffering or a fatal termination, yet fall far short of being either the sole or a materially contributing cause of the suffering or death."

National Life & Accident Insurance Company v. Brogdon, 322 S.W.2d 403, Fort Worth C.C.A., no writ history, is to the same effect.

Appellant cites and relies upon the following cases: Western Indemnity Co. v. McKechnie, 185 S.W. 615, 214 S.W. 456, Dallas C.C.A., no writ history, North American Accident Ins. Co. v. Miller, 193 S.W. 750, Amarillo C.C.A., 1917, writ ref., Robinson v. Aetna Life Ins. Co., 276 S.W. 900, Tex.Com. of App., judgment only adopted, American National Ins. Co. v. Briggs, 70 S.W.2d 491, Beaumont C.C.A., writ dism., Standard Life & Accident Co. v. Roberts, 318 S.W.2d 757, Amarillo C.C.A., writ dism. and Tix v. Employers Casualty Co., supra.

Some of these cases could, no doubt, be distinguished and explained in a manner not inconsistent with the cases from which we have quoted, others, perhaps, could not be. We will not undertake this task because we are convinced that the authorities quoted from above reflect the present state of the law upon this question.

█ It is our opinion that the points under consideration should be overruled.

There is no question but that the diseased condition of Mr. Hudman's heart contributed to his death. We believe we have set out ample evidence to sustain the finding of the trial court that the over exertions of Mr. Hudman under existing weather conditions on the day of his death were the proximate cause of his death and not the diseased condition of his heart. There is evidence from which contrary findings could have been made. Eminently qualified physicians gave conflicting opinions. The Trial Judge made his choice. We approve it because it is made upon credible testimony and is not so against the great weight and

preponderance of the evidence as to be clearly wrong or manifestly unjust.

Appellant by its last three points, jointly briefed, contends that there was no evidence to support the finding of the trial court that Hr. Hudman died of an accidental bodily injury which occurred while he was riding in his pickup truck, that such finding was against the great weight and preponderance of the evidence, and that the evidence was insufficient to support the finding of the trial court that the exertion of driving the pickup truck was a contributing cause of his death.

■ There can be no question but that an unexpected reaction of the body to unusual physical exertion is an accidental bodily injury. In Home Ben. Association v. Smith, 16 S.W.2d 357, Texarkana C.C.A., writ ref., the Court held that death due to rupture of blood vessels caused by cranking a car resulted from "accidental cause," saying:

"In its brief appellant concedes that it was uncontroverted in the evidence that Smith's death was proximately caused by a ruptured blood vessel. We think it was also uncontroverted in the evidence that the rupture was an unexpected result of Smith's attempting to crank the car as he did, and that the rupture, therefore, was an accident within the meaning of the policy, without respect to whether Smith was suffering from hardened arteries, as suggested in the evidence, or not."

There are many authorities to the same effect, some of which are Hanna v. Rio Grande Nat. Life Ins. Co., 181 S.W.2d 908, Dallas C.C.A., writ ref., Pledger v. Business Men's Accident Association, 228 S.W. 110, Tex.Com. of App., and National Life & Accident Insurance Company v. Brogdon, 322 S.W.2d 403, Fort Worth C.C.A., no writ history.

It is quite true that all of Mr. Hudman's exertion occurred outside the pickup except the driving. The reaction to the strenuous exercise outside the pickup and the exercise of driving it occurred within the pickup. That this reaction was the injury sustained by Mr. Hudman is clearly reflected by the testimony of Dr. Montgomery which we quote:

"A. I same saying that he had decreased blood supply to his heart, that he had an increased demand for blood to his heart because of unusual physical, emotional and weather conditions, and that the impinging of these two things caused his heart to fibrillate.

"Q. Did the continued exertion, driving this pickup, contribute, in your opinion, to the onset of the fibrillation?

"A. I am sure it did.

"Q. Maybe I better ask this. State the facts with regard to whether the continued exertion of driving the pickup had any contributory bearing upon his going into fibrillation?

"A. I would say that it did.

\* \* \* \* \* \*

"Q. At what time, in your opinion, did the fibrillation occur?

"A. The fibrillation occurred at the time that Gary saw him stiffen.

"Q. I see. That would have been while he was driving the pickup toward the Herring house between the gate and the house?

"A. Yes, sir.

"Q. Doctor, in medical terms, what is meant by an injury?

"A. Well, the medical definition of injury is any stress upon a part or a whole of an organism that disrupts its structure or function or both to such a degree that it results in the pathologic process.

"Q. Now is the heart an organism?

"A. The heart is an organ. The human body is an organism.

"Q. Is overexertion, coupled with emotional pressure, coupled with extreme weather conditions, a competent form of stress?

"A. I would say so. It is well recognized as such.

"Q. At any rate, ventricular fibrillation is a disruption of the function of the heart?

"A. Yes. It is the most severe sudden disruption of the heart rhythm that you can have."

Dr. Montgomery was cross-examined particularly as to his definition of injury but we do not find that he retreated from the definition given, nor do we find testimony of the other doctors who testified to be in contradiction.

Dr. Hershberger agreed that the cause of death was ventricular fibrillation.

■ We also find evidence sufficient to sustain the finding of the trial court that the exertion of Mr. Hudman in driving the pickup was a contributing cause of his death. In addition to the testimony of Dr. Montgomery quoted under these points, Dr. Hershberger stated that the act of Mr. Hudman in driving the pickup was an " * * * extra effort, and in that regard added to the total exercise for that day." Dr. Goforth testified that if Mr. Hudman had gone into an air conditioned room and relaxed instead of driving the pickup there would have been a possibility that he might not have died. Dr. Montgomery, on this subject, also testified that " * * * the cumulative effect of the stress is really far worse than the amount of stress at any one particular instant." Driving the pickup was but a continuation of the stress which Mr. Hudman was under and added to its total.

We overrule these last three points.

The judgment of the trial court is affirmed.

Affirmed.