**AMERICAN NAT. INS. CO. v. FOX.**
No. 14656.

Court of Civil Appeals of Texas.
Fort Worth.

Dec. 8, 1944.

Rehearing Denied Jan. 26, 1945.

938

Wren & Jeffrey, of Fort Worth, for appellant.

Samuels, Brown, Herman & Scott, of Fort Worth, for appellee.

McDONALD, Chief Justice.

This is a suit on a policy of life insurance. Plaintiff, the beneficiary named in the policy and the wife of the insured, recovered judgment in the court below, and the insurer has appealed.

In answer to five special issues, the jury found (1) that , the premium in question here was paid by plaintiff to a named agent of the appellant; (2) that the insured suffered a heat stroke on a specified date; (3) that the insured's death resulted, solely, directly, and independently of all other causes, from such heat stroke; (4) that the exterior of the insured's body showed visible marks or evidences caused by the heat stroke; and (5) that $1000 would be a reasonable attorney's fee.

The suit is defended principally on the theory that the policy had lapsed prior to the insured's death by reason of non-payment of the quarterly premium which was due on April 14, 1943. The plaintiff testified that she paid the premium in question to Maury Hughes, an agent of the appellant company, at her home in Fort Worth. Hughes' testimony was to the effect that he had no independent recollection of the matter, and that all he had to go by were the records of the company. All of the evidence was one way to the effect that appellant's records contained nothing to show that the premium in question had been paid, and that appellant had recorded in its books that the policy had lapsed for non-payment of the April, 1943, premium.

■ Appellant complains of the jury finding that the premium was paid, both on the ground that there was no evidence to support the finding and on the ground that the finding was against the great preponderance of the evidence, but it appears to us that the testimony of the plaintiff that she paid the amount of the premium to the agent Hughes was alone enough to support the finding.

The real ground of complaint appears to be that even if the amount of the premium was paid to the agent Hughes, such payment was insufficient to satisfy the requirements of the policy, and was not binding on the insurer. The terms of the policy relating to payment of premiums are like those set out in the opinion in American National Ins. Co. v. Tross, 138 Tex. 116, 157 S.W.2d 620, 621. The provision that is especially relied on here reads as follows:

"All premiums are due and payable in advance at the home office of the company, but may be paid to an authorized agent of the company in exchange for a receipt duly signed by the president or a secretary of the company and countersigned by the agent named therein."

From the undisputed evidence it appears that appellant maintained an office in Fort Worth, and that the agent Hughes was at the time in question an assistant superintendent in the Fort Worth office. For the sake of this case the policies of insurance issued by appellant may be divided into two classes, those designated as industrial policies, and those designated as ordinary policies. On the industrial policies the premiums were payable weekly, and were customarily collected by agents, of whom there were some sixty or seventy employed in the Fort Worth office, who called at the homes of the policy holders each week for the purpose of collecting premiums. The policy involved in this suit was of the class designated as ordinary policies, being those on which the premiums were payable on an annual, semi-annual, quarterly, or monthly basis. Plaintiff, and other members of her family living at the same home address in Fort Worth, carried some of the industrial policies, and plaintiff's husband carried the so-called ordinary policy which is here involved, in which, as has been said, plaintiff was the named beneficiary.

While much appears in the record concerning the payment of the quarterly premium which fell due on January 14, 1943, we believe that the testimony concerning the payment of that premium is not controlling upon any point involved in the appeal, so we shall not further discuss it.

One of the agents who collected premiums on industrial policies was named Dumas. On March 29, 1943, it was known that Dumas was leaving the employ of appellant, and the agent Hughes, in the pursuance of his admitted duties, was accom-

panying Dumas on a trip around the territory assigned to Dumas. Pursuant to his duties and his instructions, Hughes was doing the actual collecting on that day. No issue was submitted to the jury touching upon Hughes' authority to collect the premium in question, so, appellant having made due complaint of such failure to submit issues to the jury, we must determine whether the evidence is sufficient as a matter of law to show that Hughes had authority to collect the premium which the jury found was paid to him, and whether such payment was binding on the appellant. Our conclusion, for reasons which we shall give, is that the evidence does show a valid payment of the premium, as a matter of law.

The policy provides, as above shown, that the premium shall be paid either at the home office of the company, or to an authorized agent in exchange for a receipt signed by certain named officers of the company. No receipt of any kind was given to plaintiff at the time the premium was paid to Hughes. Appellant argues, therefore, that a payment to Hughes, for which no receipt was given, could not satisfy the requirements of the policy.

■■ What we consider to be a sound view of this type of policy provision is found in the opinion in Kansas City Life Ins. Co. v. Elmore, Tex.Civ.App., 226 S.W. 709, 713:

"At this time we will give our views on the terms of the policy. A party, after he has accepted a policy giving powers to an agent to collect renewal premiums only upon a receipt furnished and signed by the general officers and countersigned by the agent, written in the face of the policy, has notice that the agent's power in collecting is limited. Ordinarily he could not rely on the assumption of the agent to act without being in possession of the proper receipt. If the insured has made payments to an agent without such receipt, he will be required to show a waiver by the insurer or estoppel upon it to deny such powers in the agent. If the insured makes payment to an agent with such limited power, in the absence of an agreement, waiver, or estoppel, he in effect makes the agent his own, and the payment must reach the insurer in the time and in the form which will satisfy the terms of the policy as to payment. Of course, the stipulation for a certain kind of receipt would not necessarily make any kind of receipt or proof of pay-

ment inadmissible. It is a provision that could be waived if the evidence establishes the agent was in fact authorized to collect the premium."

The same view appears to have been taken by the court in American National Ins. Co. v. Collins, Tex.Civ.App., 149 S.W. 554. In American National Ins. Co. v. Tross, 138 Tex. 116, 157 S.W.2d 620, 621, it is said:

"Undoubtedly the insurance company could send out an agent with authority to collect a monthly or annual premium without having in his possession an official receipt therefor, and if an agent with such authority should collect the premium under such circumstances it would be binding on the company."

Decisions from other jurisdictions may be found in the annotation in 85 A.L.R. 749.

■ We conclude from these authorities that the payment to Hughes was binding on the company if he had actual authority to collect the premium without having in his possession and without delivering to plaintiff the kind of receipt described in the policy.

While appellant argues strenuously that Hughes and the other agents working in the Fort Worth office were only soliciting agents, it is clear that they regularly collected premiums on the industrial policies. It is also clear from the testimony of appellant's own employees, including the superintendent of the Fort Worth office, that these agents were authorized and instructed to accept payment of premiums on ordinary policies from holders of industrial policies who might also hold ordinary policies. The evidence in this respect is undisputed. The so-called official receipts, of the kind described in the policy, were customarily sent to the Fort Worth office. The first premium notice would be sent out from the home office, but if the premium was not paid by its due date the employees of the Fort Worth office would give the holder of an ordinary policy a second notice, usually by telephone. The so-called official receipt was not given to the agent to deliver, but he was provided with a form of temporary receipt, which he was instructed to give to the policy holder, and when payment had been turned in to the Fort Worth office, it in turn would mail the official receipt to the policy holder. Books were kept in the Fort Worth office for the

purpose of recording payment of premiums on ordinary as well as industrial policies. As we see it, there can be no doubt about Hughes having the authority to collect the premium without delivering an official receipt therefor. The superintendent testified that the agents were instructed to give the temporary receipts to the policy holders, and that he had never known of one failing to do so. He further testified that the agent making the collection had no authority to give the policy holder the official receipt, the latter being held in the office until the premium was paid. When the agent brought the money collected on an ordinary policy into the office, he would report the collection on a prescribed form. The agent would not be required in the office to exhibit any evidence that he had given the policy holder a temporary receipt. The superintendent testified that if the agent brought the money into the office, and paid it to the cashier, the premium would then be paid, as far as the company was concerned, whether or not he had complied with the instruction to give the policy holder a temporary receipt.

As is said in the opinion in the Elmore case above quoted from, the purpose of the requirement in the policy that the premium be paid in exchange for an official receipt is to assure that the agent making the collection has authority to do so. The policy holder may test the agent's authority, so to speak, by determining whether the company has placed him in possession of the official receipt. But the possession by the agent of the official receipt, or the delivery of it to the policy holder, cannot matter where the company has actually authorized the agent to make the collection. If the company authorizes the agent to make the collection, and instructs him to deliver a temporary receipt, it will be the actual payment of the premium to the agent that will continue the insurance in force. For reasons of its own the company here elected to authorize its agent to collect the premium in a manner different from that provided for in the policy. It cannot escape the effect of payment of the premium to the authorized collection agent by a mere showing that the agent failed to give the policy holder a temporary receipt for the money. It was the company who first departed from the provisions of the policy, by sending out an agent authorized to collect the premium without giving the policy holder an official receipt. As said in the Tross case, supra, it could do this, but it is in no position now to say that the acceptance by the policy holder of a mode of payment first instituted by the company itself can operate to relieve the company of the consequences of a payment of the premium to one who had actual authority from the company to receive it.

Appellant complains of the refusal of the court, over proper objections, to submit to the jury the questions of waiver and estoppel. We doubt if the case turns upon estoppel. As to the waiver of compliance with the exact terms of the policy, which involves in it the question of the authority given to the agent Hughes, the evidence with respect to such matters is undisputed, and came from the appellant's own representatives. We have here only the problem of applying the law to undisputed facts. We hold that the pleadings and the evidence are sufficient on the questions relating to payment of the premium in question, and overrule all points of error pertaining thereto.

Complaint is made of variance between plaintiff's pleadings and the terms and provisions of the policy. The policy was introduced in evidence at the beginning of the trial, without objection from appellant. The pleadings were sufficient to identify the policy, and it is evident from the record as a whole that the parties and the trial court tried the case on the issues raised by the terms and provisions of the policy itself. Rule 67, Texas Rules of Civil Procedure, relieves the case of any reversible error in this respect.

Appellant contends that the pleadings and proof are insufficient to support the recovery for accidental death under the double indemnity provisions of the policy, and complains of the manner of submission of this feature of the case to the jury.

The policy provides for double indemnity where death results directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental means evidenced by internal injury revealed by autopsy or evidenced by visible contusion or wound on the exterior of the body, and excludes liability where the injury is received from physical or mental infirmity.

This feature of the case was submitted to the jury in three issues, inquiring (1)

whether the insured suffered a heat stroke on the named date, (2) whether his death resulted solely, directly, and independently of all other causes from the heat stroke, and (3) whether the exterior of his body showed any visible marks or evidences caused by the heat stroke. Appellant complains of the refusal of the court to submit the issue in the language of the policy.

The essence of the double indemnity provision is that death must have resulted from bodily injuries, and that the bodily injuries must have been effected through external, violent, and accidental means.

■ Although there is a division of authority on the question in other jurisdictions, it is settled in Texas that a heat stroke may be a bodily injury within the meaning of a policy provision like the one here involved. Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S.W. 673, L.R.A.1916E, 945, Ann.Cas.1918A, 517; Metropolitan Life Ins. Co. v. Funderburk, Tex.Civ.App., 81 S.W.2d 132, error dismissed; American Nat'l Ins. Co. v. Bennie, Tex.Civ.App., 106 S.W.2d 336, error refused. In the last cited case the court quotes with approval the following statement taken from the annotation in 17 A.L.R. 1197:

"It is held by the weight of authority, and apparently the better reasoned cases, that a sunstroke, suffered by one unexpectedly, is within the protection of an accident policy insuring against bodily injuries sustained through external, violent, and accidental means."

The reason announced by all the courts who adopt this view is that a sunstroke, although it may be regarded as a disease by medical science, is generally regarded as an accident by the average layman who purchases accident insurance. The question is discussed at great length in the Bryant case, supra, and for another comprehensive discussion of the leading cases see Richards v. Standard Acc. Ins. Co., 58 Utah 622, 200 P. 1017, 17 A.L.R. 1183. Appellant cites the opinion of the United States Supreme Court in Landress v. Phoenix Mut. Life Ins. Co., 291 U.S. 491, 54 S.Ct. 491, 78 L.Ed. 934, 90 A.L.R. 1382, but our Texas courts have adopted the view expressed in the dissenting opinion of Mr. Justice Cardozo. See American Nat. Ins. Co. v. Bennie, supra.

■ From these authorities it appears that it will be held as a matter of law that the sunstroke is accidental where it is suffered unexpectedly while the insured is engaged in his ordinary duties or occupation. In the Landress case Mr. Justice Cardozo thought that it should be so held where the insured suffered a sunstroke while playing golf. In the case before us the issues submitted to the jury inquired whether the insured suffered a heat stroke, and whether it was the exclusive cause of his death. The issues did not inquire whether the heat stroke was caused by an accident. Appellant contends that the case should have been submitted in the language of the policy. His objections in the trial court, and his points of error, are sufficient to raise the questions here being discussed.

■ Asking the jury whether the insured suffered a heat stroke was a more limited submission than asking them whether he suffered a bodily injury. We think it was the better practice in this case to limit the inquiry to the specific injury claimed, and the limited manner of submission could not have operated to the prejudice of the appellant. The holding of the courts is to the effect that a heat stroke suffered unexpectedly is accidental as a matter of law, and also that it is external and violent. In the Bryant case it is recognized that a heat stroke could be suffered under circumstances where it would not be accidental. We should think, for instance, that it might not be held accidental as a matter of law where the insured voluntarily exposed himself to known danger of heatstroke, or in such circumstances as that he might reasonably have anticipated that he would suffer a heatstroke. In the present case there was testimony sufficient to show, if believed by the jury, that the insured was a dental technician, that he worked at his trade from nine to eleven in the forenoon of July 25, 1943, that he left his place of employment at eleven and was not seen by any witness testifying in the case until one in the afternoon, when he was found by two policemen, lying in the doorway near a stairway at the hotel where he lived, partially clothed, very warm, and drunk. He was taken to jail, and at seven-thirty that evening was taken to a hospital where he received treatment. He was unconscious when he reached the hospital, and his temperature registered not less than 109. The physician who labored with him for several hours testified that he had suffered a heat stroke, and that the heat stroke

caused his death. This physician testified that he could not detect the odor of alcohol on his breath, but for the purpose of determining whether issues should have been submitted to the jury we must assume here that the jury would have believed the testimony of the policemen who said that he was drunk.

■ To reduce the question to simple terms, is there a jury question as to the accidental nature of the heat stroke, where the insured was found suffering from a heat stroke of such serious character that he died therefrom a few hours later, where the evidence does not disclose where the insured had been for two hours before he was found, where he appeared to be sober and in good physical condition when last seen, and where he was drunk when found two hours later? If the evidence had shown that the insured was going about his usual occupation, or walking down the street, or engaged in some other activity where he would not reasonably forsee that he would suffer a heat stroke, the heat stroke would have been accidental as a matter of law, if we correctly interpret the above decisions. The burden was upon the plaintiff to make out a case, aided by such presumptions as are, recognized by the law. There is no presumption that the insured voluntarily brought the danger upon himself. The presumption, based upon the recognized instinct of self-preservation, is to the contrary. The undisputed evidence showed that it was very hot on the day in question, and the physician who treated the insured said that he witnessed about twelve deaths caused by heat stroke on and near that date. There is a total absence of any evidence tending to show that the insured voluntarily exposed himself to the heat in a reckless or heedless manner, or that he suffered the attack under circumstances where he could reasonably have foreseen that he would suffer a heat stroke. It is of some significance that we have found no case, in jurisdictions which recognize a heat stroke as a bodily injury as distinguished from a disease, where the heat stroke involved was held not to be accidental. It might be thought that the evidence of drunkenness would raise the issue whether the heat stroke was accidental. We are not inclined to think so, especially in view of the finding of the jury that the heat stroke was the sole cause of his death. Appellant endeavored industriously to develop evidence showing that the death resulted from excessive alcoholism, and that theory seems not to have been accepted by the jury. To sum up, we are not able to find any evidence upon which the jury could have found that the heat stroke was not accidental, if such an issue had been submitted to them.

■ The policy provides that the bodily injury must be evidenced by internal injury revealed by autopsy, or by visible contusion or wound on the exterior of the body. The jury was asked whether the exterior of the body of the insured showed any visible marks or evidences caused from the heat stroke. Appellant complains of the difference in the wording of the issue from the wording of the policy provision. We think that the issue submitted to the jury made substantially the same inquiry as would have an issue written in the language of the policy, bearing in mind the nature of the injury here involved. Technically speaking, a contusion is a bruise or damage which does not break the skin, and a wound involves a breaking of the skin. It is obvious that the policy could not reasonably insure against heat stroke, and at the same time require that the heat stroke be evidenced by a bruise of the kind made by a blow, or by an open wound, when those are not the usual evidences of a heat stroke. The kind of "contusion" or "wound" which the body must show in a heat stroke case naturally must be the kind of external evidence that would be produced by a heat stroke. The testimony of the physician who treated the insured was sufficient to show this. The issue submitted by the court was sufficient to obtain the essential finding that was required to show whether there was external evidence of the heat stroke. In support of our holding that the kind of contusion or wound required to be shown is that which corresponds with the nature of the bodily injury suffered, we cite Warbende v. Prudential Ins. Co., 7 Cir., 97 F.2d 749, 117 A.L.R. 760.

■ The first page of the policy provides for payment of $2500 upon death of the insured. On the second page appears a typewritten provision to the effect that the proceeds as a death claim shall be paid in monthly installments of $72.97 for three years. Judgment was rendered for $5000, the amount of the policy in view of the double indemnity feature, plus additional

amounts for penalty, interest and attorney's fee. Appellant contends that judgment should have been rendered only for the matured installments, and that penalty, interest and attorney's fee should have been based on the amount of the matured installments. Appellee contends that the judgment is correct on the theory ·that there was an entire repudiation of liability, as distinguished from a mere failure or refusal to pay the· matured installments. The action of the trial court appears to us to be correct, under such cases as Pollack v. Pollack, Tex.Com.App., 39 S.W.2d 853; Id., Tex.Com.App., 46 S.W.2d 292; Universal Life & Accident Ins. Co. v. Sanders, 129 Tex. 344, 102 S.W.2d 405; and Southland Life Ins. Co. v. Gatewood, Tex.Civ.App., 115 S.W.2d 723, affirmed by Supreme Court in case under same style, reported in 135 Tex. 177, 141 S.W.2d 588. In the case before us the undisputed evidence shows that appellant refused before suit was brought and thereafter continued to refuse to assume liability because of the alleged non-payment of the April, 1943, premium.

Appellant presents points of error complaining of allegedly inadmissible evidence, improper cross-examination of witnesses, and argument of counsel to the jury. We have carefully examined these contentions, and believe that none of them presents reversible error. They are discussed in detail in an unpublished supplement to this opinion.

Appellant complains of the failure to deduct from the judgment the sum of $9.68, the amount of the July, 1943, premium, because the policy provided that unpaid premiums for the current year should be deducted from any sums due the beneficiary. Appellant having failed to plead this small off-set or otherwise bring it to the attention of the trial court, we will treat it as having been waived. Rule 94.

Complaint is made of the recovery of attorney's fee. The argument in the brief appears to be that the amount of the attorney's fee is predicated upon the theory that the whole amount of the policy, as distinguished from the matured installments, was involved in the suit. What we have said applies by implication to this contention. Appellant says that it was a question for the jury whether any attorney's fee was recoverable. It appears to be undisputed that plaintiff promptly made demand on the policy, and that appellant denied liability and continued to deny liability on the ground above discussed. We are not able to see that there was any issue for the jury other than the amount of the fee.

Finding no reversible error, we overrule all points of error, and affirm the judgment of the trial court.