**Darlene ZORN et al., Plaintiffs,**

v.

**AETNA LIFE INSURANCE COMPANY,
Defendant.**

**Civ. A. No. 4275.**

United States District Court
E. D. Texas,
Tyler Division.

Nov. 8, 1965.

Denning Schattman, of Spurlock & Schattman, Fort Worth, Tex., for plaintiffs.

Pinkney Grissom, and George C. Chapman, of Thompson, Knight, Wright & Simmons, Dallas, Tex., for defendant.

OPINION

SHEEHY, Chief Judge.

The Plaintiffs, the surviving widow and minor children of R. B. Zorn, deceased, are seeking to recover as the beneficiaries under a group health and accident insurance policy, the death benefits provided for by said policy, together with the Texas statutory penalty and attorneys' fees. The case was tried before the Court without a jury. The pertinent facts from the stipulations of the parties and the evidence offered at the trial are as hereinafter stated.

The group policy in question was initially issued on December 27, 1961, by the Defendant, hereinafter referred to as Aetna, and was made effective retroactively to August 1, 1961. Skelly Oil Company is the named policy holder. The insurance policy was delivered to Skelly Oil Company in the State of Oklahoma.

In May, 1961, R. B. Zorn was employed by Skelly Oil Company as a pumper. In October 1961, while living and working for Skelly Oil Company near Tyler, Texas, as a pumper of oil and gas leases, Zorn made application for coverage under the group policy in question, and a certificate of insurance was issued by Aetna which provided, among other coverages, for accidental death benefits in the

amount of $75,000.00. Premiums on the policy were paid by Zorn to the Skelly Oil Company which, in turn, remitted payment to Aetna. At all times material to this case Aetna was authorized to and was doing business in the State of Texas.

On the morning of November 26, 1962, Zorn arrived at the Skelly lease near Tyler, where he was then assigned, at approximately 7:00 o'clock in the morning. Prior to this date, Zorn had apparently enjoyed good health and had experienced no symptoms of any extraordinary health problems. In following the normal course of the performance of his duties, Zorn attempted to start a small, handcranked Wisconsin engine at the site of one of the Skelly tank batteries. Due to the cold and damp weather conditions which prevailed at that time, the engine proved to be unusually difficult to crank and required an extraordinary degree of physical exertion by Zorn to pull through on the starting rope. Another employee arrived at the site and also attempted to crank the engine, but was barely able to pull the starting rope through one engine cycle. Zorn made several more tries before they decided to wait until the weather improved. They then proceeded to a nearby tank battery where Zorn, without assistance, changed out a two inch pipe nipple on a separator which had been leaking. He was next seen a few minutes later climbing the stairs of the tank battery where he began the process of "topping-out" the tanks.

Zorn was discovered a short time later, at about 7:30 a.m., sitting at a table in a shed referred to by the Skelly employees as the "kitchen," which was located about a hundred and fifty yards from the tank battery. When his fellow employees approached, Zorn was leaning over the table with his head on his arms. He complained of a severe headache and indicated the rear portion of his head. The other two pumpers told him to take it easy, and after a few minutes they left the kitchen to perform a task at a nearby well site. When they returned, Zorn's condition had obviously worsened, and he again complained of a severe pain in his head. They left once again, and when they returned the second time they suggested to Zorn that he go home since he had not improved any and was obviously in pain. Zorn consented and went to his pick-up truck and drove off in the direction of his home.

After Zorn left the other two pumpers drove over to another well site to put anti-freeze in the radiator of an engine located there and were on their way to another well when they came upon Zorn's truck parked on the side of the road. Zorn was seated upright behind the steering wheel, but was unable to reply to their questions. They observed that at this time he was very pale and was perspiring profusely in spite of the cold weather, and that there was a saliva discharge from his mouth. They assisted Zorn from his own vehicle into the other pick-up truck and proceeded at once to the Medical and Surgical Clinic in Tyler, about seven miles away. By this time Zorn had a "glassy stare" in his eyes and was perspiring heavily. En route to the clinic Zorn became rigid and stiffened and had to be held upright. Upon arriving at the clinic shortly before 10:00 o'clock a.m., he had to be lifted bodily from the truck and carried inside. His eyes were then closed, and he appeared totally unconscious. Zorn died at about 1:00 o'clock p.m. the same day.

The cause of Zorn's death was a massive subarachnoid hemorrhage resulting from the rupture of a blood vessel in the brain just below the area known as the Circle of Willis. The Court finds that the hemorrhage was the result of the bursting of a berry aneurysm—an abnormal weakness in the wall of the blood vessel—which aneurysm had existed for some time prior to the day of Zorn's death. The Court further finds that the unusual physical exertion engaged in by Zorn on the morning of his death caused an extraordinary strain to be placed on the walls of the blood vessel at the site of the aneurysm which, in turn, caused the aneurysm to burst

or rupture. But the Court also finds that if it had not been for the pre-existing aneurysm, the physical exertion engaged in by Zorn on the morning in question would not 'have caused the blood vessel in Zorn's brain to rupture. Thus while the Court finds that the unusual exertion engaged in by Zorn on the morning in question injured the blood vessel at the site of the aneurysm to the extent that the aneurysm was caused to burst or rupture and thereby became the proximate or precipitating cause of Zorn's death, the Court also finds that the injury to the blood vessel and Zorn's resulting death was contributed to by the pre-existing aneurysm.

The initial question to be decided in this case is whether Oklahoma or Texas law is applicable. In view of the fact that Aetna was doing business in Texas at the time the policy of insurance in question was issued and at all times subsequent thereto, and that the Plaintiffs herein, the named beneficiaries in the policy, were residents of the State of Texas at the time any rights they may have to payment. of the proceeds under the policy accrued, the provisions of Article 21.42 of the Texas Insurance Code, V.A.T.S. are applicable and will cause the construction of the policy and the rights of the parties hereto to be governed by Texas law. See Metropolitan Life Insurance Co. v. Wann (Tex.Com.App.1937), 130 Tex. 400, 109 S.W.2d 470, 115 A.L.R. 1301; John Hancock Mutual Life Insurance Co. v. Schroder (5 Cir., 1965), 349 F.2d 406; and Fireman's Fund Insurance Co. v. Wilburn Boat Co. (5 Cir., 1958), 259 F.2d 662.

Under the provisions of Section 1 of Article II of the policy, accidental death benefits are provided only:

"If an employee suffers bodily injury caused by an accident and as a direct result of such injury and, *to the exclusion of all other causes*, sustains within not more than ninety days after the date of the accident which causes such injury any of the losses listed in the Table of Benefits in this section, then, provided:

(a) the injury occurs while insurance is in force for the employee under this policy; and

(b) *the injury is evidenced by one or more visible contusions or wounds on the exterior of the body*, except in the case of drowning; and

(c) the loss resulting from the injury *is not excluded from coverage in accordance with Section 3 of this Article*;" (Emphasis supplied.)

The pertinent provisions of Section 3 of Article II of the policy (the exclusionary clause) are:

"No insurance is provided and no benefits shall be payable *under Section 1* of this Article with respect to any loss or under Section 2 of this Article with respect to disability terminating in death *if the loss under Section 1* or the disability under Section 2 *results from any injury caused or contributed to by, or as a consequence of, any of the following excluded risks, even though the proximate or precipitating cause of said loss or disability is a bodily injury caused by an accident;*

"(a) *bodily* or *mental infirmity;* or

"(b) *   *   *; or

"(c) *disease of any kind*," (Emphasis supplied.)

In light of the above quoted provisions of the policy and the facts of this case, there are three questions as to construction of the policy provisions presented, namely, (1) was Zorn's injury "caused by an accident"; (2) if such injury were "caused by an accident," was it evidenced "by one or more visible contusions or wounds on the exterior of the body"; (3) was Zorn's death contributed to by or a consequence of a bodily infirmity or pre-existing disease?

Texas courts have apparently drawn a distinction between policies which insure

against "accidental death" and those which insure against "death by accidental means."[1] The policy in this case is of the latter more restrictive category, but there is a conflict among the decisions of the various jurisdictions as to the test to be applied in determining when the death or injury is produced by "accidental means." In some jurisdictions it is required that the means as well as the result must be accidental. The Texas courts, however, appear to be committed to the view that "accidental means" are those means that produce *effects or results* which are not the natural and probable consequence of the means employed and, therefore, cannot be reasonably anticipated or foreseen as a result of such means. See International Travelers' Asso. v. Francis (1930) 119 Tex. 1, 23 S.W.2d 282; and Spencer v. Southland Life Insurance Co. (Tex.Civ. App., 1960) 340 S.W.2d 335, 337 (error ref'd); and Hanna v. Rio Grande Life Insurance Co. (Tex.Civ.App., 1944) 181 S.W.2d 908, 909 (error ref'd). Tested by the Texas rule it follows that the injury to Zorn on the morning in question was produced by accidental means or "caused by an accident" within the terms of the policy in question. As above pointed out, conditions on the morning of Zorn's injury caused him to exercise an unusual, extraordinary degree of effort in attempting to perform his duties. Even though the activities which produced the injury were voluntarily undertaken, the effect—the rupture of the aneurysm in the blood vessel in the brain—was not intended by Zorn and was not a consequence that reasonably could have been anticipated or foreseen.

As indicated by the above quoted provisions of Section 3 of Article II of the policy (the exclusionary clause), no insurance is provided and no benefits are payable with respect to any loss if such loss results from an injury which was caused or contributed to by or as a consequence of any "bodily infirmity" or "disease of any kind", even though the proximate or precipitating cause of said loss was a bodily injury caused by an accident. Neither party has cited any Texas authority, and the Court has found none, which attempts to define either the term "bodily infirmity" or the term "disease." However, in reviewing the cases in other jurisdictions, it was found that there are several cases in which it was specifically decided that an aneurysm is a bodily infirmity. See cases collected in Annotation, 75 A.L.R. 2d 1238. No case has been found in which a contrary result was reached.

In Black's Law Dictionary an "infirmity" is defined as an ailment or disease of a substantial character, which apparently in some material degree impairs the physical condition and health of the insured and increases the chance of his death or sickness. An abnormal weakness in the wall of a blood vessel plainly falls within such definition. Thus, the Court finds and concludes that the pre-existing aneurysm in the blood vessel in Zorn's brain constituted a "bodily infirmity" within the meaning of the exclusionary clause of the insurance policy, and since Zorn's injury was contributed to by said aneurysm, Aetna is not liable for the payment of the death benefits provided for in the policy in question.

Although the conclusion set forth in the final sentence in the next preceding paragraph is dispositive of this case, it would be well to discuss to some degree the provisions of the policy that required the "injury" to be evidenced by one or more visible *contusions* or *wounds* on the exterior of the body (except in the case of drowning). The ordinary definition of "contusion" is a bruise without a breaking of the skin, with "wound" being defined as a breaking of the skin. In the instant case there is no evidence that, as a result of Zorn's injury, there were any visible wounds or contusions meeting such definitions on the exterior of his body. The only symptoms exhibited by Zorn, which were symptoms

1. Pledger v. Business Men's Accident Asso. (Tex.Com.App.1921) 228 S.W. 110.

that usually follow a subarachnoid hemorrhage such as that suffered by Zorn, were excessive perspiration, discharge of saliva, a stare or glassy look in the eyes, partial paralysis, a semi-comatose condition and finally muscular rigidity and complete coma. If it were not for the decision of the Texas Court of Civil Appeals in American National Insurance Co. v. Fox (Tex.Civ.App., 1944) 184 S.W.2d 937 (error ref'd., want of merit), this Court would have no difficulty in finding and concluding that Zorn's injury and resulting death did not come within the coverage of the policy because his injury was not evidenced by one or more visible contusions or wounds on the exterior of his body. In that case the insured died of a heat stroke and recovery was allowed under an insurance policy insuring against death from bodily injuries sustained through external, violent and accidental means evidenced by visible contusions or wounds on the exterior of the body. While there was evidence to the effect that the insured was found unconscious, was very warm and that his temperature did not register less than 109 degrees, there was no evidence that there was any bruise or damage to the skin or any wound or breaking of the skin. The Court held that a heat stroke suffered unexpectedly is an accidental bodily injury sustained through external and violent means. Although the court recognized that a "contusion" is a bruise or damage which does not break the skin and a "wound" involves a breaking of the skin, it held that the kind of "contusion" or "wound" which, under the policy of insurance in question in that case, the body must show in a heat stroke case is the kind of external evidence that would be produced by a heat stroke. In so holding, the court stated:

"Technically speaking, a contusion is a bruise or damage which does not break the skin, and a wound involves a breaking of the skin. It is obvious that the policy could not reasonably insure against heat stroke, and at the same time require that the heat stroke

be evidenced by a bruise of the kind made by a blow, or by an open wound, when those are not the usual evidences of a heat stroke. The kind of "contusion" or "wound" which the body must show in a heat stroke case naturally must be the kind of external evidence that would be produced by a heat stroke."

The *Fox* case is the only Texas authority which this Court can find relating to that question. It is evident that the court in that case extended the definition of the terms "contusion" and "wound" beyond their accepted meanings and made the contract include that which, clearly, was not intended to be included. Such action on the part of the court was beyond its power. Royal Indemnity Company v. Marshall (Tex.Sup.Ct., 1962) 388 S.W.2d 176, 181, and National Surety Corp. v. Western Fire & Indemnity Co. (5 Cir., 1963), 318 F.2d 379, 387. While this Court is convinced that the holding in *Fox* is wrong, it is *Erie* bound to apply the law laid down in that case even though it was decided by an intermediate appellate court, in the absence of convincing evidence that the Supreme Court of Texas would decide differently. Stoner v. New York Life Ins. Co. (1940) 311 U.S. 464, 467, 61 S.Ct. 336, 85 L.Ed. 284. In view of the conclusion above reached to the effect that Zorn's injury and resulting death fell within the exclusionary clause of the policy, it will not be necessary for this Court to search the authorities in order to ascertain whether there is any evidence that the Supreme Court of Texas would hold differently than held by the Court of Civil Appeals in *Fox* as to the meaning of the words "contusion" and "wound" as used in the policy of insurance in question.

The Clerk will forthwith enter judgment for the Defendant to the effect that the Plaintiffs take nothing, that the action be dismissed on the merits, and that the Defendant recover of the Plaintiffs its cost of action.

This Opinion will constitute the Findings of Fact and Conclusions of Law in this cause.