**AETNA LIFE INSURANCE COMPANY,**
**Appellant,**

v.

**June KEGLEY, a Widow, Appellee.**

**No. 23437.**

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1967.

Rehearing En Banc Denied
Oct. 9, 1967.

Certiorari Denied March 4, 1968.

See 88 S.Ct. 1033.

Elton Gilliland, W. O. Shafer, James M. O'Leary, Odessa, Tex., for appellant.

John J. Watts, Odessa, Tex., for appellee.

Before BELL and GODBOLD, Circuit Judges, and NOEL, District Judge.

NOEL, District Judge:

This appeal is taken on the ground that the district court's instructions to the jury pertaining to sole cause of death and visible contusion or wound on the exterior of the body were not in conformity with the language of the accident insurance policy or with the Texas law. We agree. The judgment of the district court is reversed, and the cause is remanded with directions to enter judgment for Aetna Life Insurance Company.

In 1961, Aetna Life Insurance Company issued a group accident policy to Halliburton Company for the benefit of the company employees. Joseph Felix Kegley, deceased husband of appellee, was an employee and entitled to coverage under this policy on the date of his death.

Kegley was forty years old, considered to be a good worker and appeared to be in good health immediately before his death. In his work for Halliburton, Kegley was described as a treater, a cementer, and a supervising foreman of the frac crews.

During the five-day period preceding death, Mr. Kegley was under some emotional strain and had been working between ten and nineteen hours a day. After sleeping about four hours, Kegley reported for work on the morning of December 30, 1961. He began the day by loading out a Halliburton truck, which included lifting a number of 100-pound sacks of chemicals and some pipe. Kegley drove the truck to a lease site. After arriving at the lease, he set up a frac-o-meter and pressure recorder (weighing 75–85 pounds and 45–50 pounds, respectively). This was work he normally, although intermittently, performed. Kegley did not complain of any difficulties, and nothing unusual was reported.

When the employee of the lessee arrived, Kegley and another Halliburton employee walked over to meet him. After walking about fifty feet, Kegley grabbed onto a nearby truck and immediately fell to the ground, unconscious. He never regained consciousness. Several witnesses to the incident recalled that after he had collapsed, his lips turned a bluish color.

An ambulance took Kegley to the hospital, where he was pronounced dead upon arrival. The attending physican, Dr. Fred Prout, concluded that death was caused by a coronary thrombosis and recorded this conclusion on the death certificate.[1] No autopsy was performed.

1. Below the space designated immediate cause of death, which contains Dr. Prout's diagnosis "coronary thrombosis," the death certificate provided space to explain what

June Kegley, the widow of deceased and plaintiff below, gave Aetna notice of the death, but Aetna has refused to recognize the death as one covered by the terms of the group policy.

Trial was to a jury, which returned a verdict for the widow, and judgment was entered accordingly.

The pertinent provisions of the policy read as follows:

"If an employee suffers a bodily injury caused by an accident and as a direct result of such injury and, to the exclusion of all other causes * * * [sustains a covered loss, he may recover] * * * provided:

\* \* \* \* \* \*

"(b) the injury is evidenced by one or more visible contusions or wounds on the exterior of the body, except in the case of drowning; and

"(c) the loss resulting from the injury is not excluded from coverage in accordance with Section 3 * * *

\* \* \* \* \* \*

"Section 3. Exclusions

No insurance is provided and no benefits shall be payable * * * if the loss * * * is caused or contributed to by, or is the consequence of, or is in any way attributable to, any of the following excluded risks, even though the proximate or precipitating cause of said loss or disability is a bodily injury caused by an accident:

"(a) bodily or mental infirmity; or

\* \* \* \* \* \*

"(c) disease of any kind, except a pyogenic infection attributable solely to and * * * the proximate result of an injury not excluded. * * *"

It is the contention of appellee that overexertion for four or five days preceding death caused a blood vessel to rupture, thereby releasing an abnormal amount of blood into a coronary artery, which caused the artery to become blocked or occluded, producing a coronary thrombosis. Appellee argues that this was a "bodily injury caused by an accident," and that recovery can be had under the policy provisions. Appellee further argues that the blueness in the lips observed after Kegley's attack met the policy requirement that there be "one or more visible contusions or wounds on the exterior of the body."

It is the contention of Aetna that Kegley was suffering from atherosclerosis, a degenerative heart disease which results in the narrowing of blood vessels, and that the disease contributed to or caused an occlusion of the artery, a coronary thrombosis. Aetna further contends that blueness in the lips is not a visible contusion or wound on the exterior of the body.

At trial, a considerable amount of medical testimony was received. Plaintiff offered the testimony of Dr. Fred Prout, who had been Kegley's physician for a number of years. He was the only medical witness who examined Kegley. Dr. Prout stated that Kegley had no prior history of heart trouble.

Dr. Prout had last examined Kegley in late September of 1961, after Kegley had suffered an attack of virus influenza. On making his diagnosis, Dr. Prout found Kegley to be suffering from some embarrassment of the heart muscles and the vessels surrounding the heart. Kegley's blood pressure, however, was normal. The doctor asked that Kegley return at a later date for a complete physical examination but he did not do so.

Dr. Prout stated that he bowled with Kegley weekly and that this continued after the last examination; that Kegley never complained of any illness or pain; and that when last seen by the doctor, Kegley appeared to be in good health.

After hearing counsel for the appellee state a series of hypothetical facts corresponding to those surrounding the death of Kegley, Dr. Prout gave his opinion

the cause of death was "due to." This space was left blank.

The certificate of death also provided space to list "other significant conditions contributing to death but not related to the terminal disease condition," or to "describe how injury occurred." These spaces were not filled.

that the coronary thrombosis was caused by overexertion.

The same hypothetical facts were stated to two other medical experts called by the appellee. They, too, were of the opinion that overexertion, fatigue, and mental stress and strain caused a blood vessel to rupture, and that the resulting hemorrhage caused the coronary thrombosis. Assuming Kegley had a normal heart, the two doctors gave their opinions that overexertion could have been the sole cause of the coronary thrombosis.

The appellant called one medical expert who was of the opinion that there could be no coronary thrombosis without preexisting disease (atherosclerotic coronary heart disease), and, therefore, Kegley could not have had a normal heart at the time of the attack leading to his death.

The district judge, over the objections of appellant, gave the jury the following instructions:

> Under the law of Texas, if said overexertion, overfatigue, physical and mental stress for the period of four to five days preceding the death * * * was a proximate cause of his death, by either causing the coronary thrombosis, or by aggravating the preexisting disease, if any, * * * under the law a bodily injury[2] occurring under such circumstances would be one to the exclusion of all other causes. [Plaintiff may recover] as long as you believe that such overfatigue, overexertion, mental stress or worry, or loss of sleep and rest * * * prior to the death * * * was a proximate or efficient cause of his death * * * even though disease may have been a secondary cause thereof.
>
> By the term "Proximate Cause" as herein used, means the moving and efficient cause, without which the injury in question would not have happened.

In this case the Defendant has also contended by testimony which it has offered in this case that blueness of the lips would not be an injury that is evidenced by one or more contusions or wounds on the exterior of the body. In this connection, you will not be controlled by the medical or commonly understood definitions of "visible contusions" or "wounds" but you are further instructed that if you believe from a preponderance of the evidence that the accidental bodily injury, if any, * * * caused the blueness around the lips of the said Joseph Felix Kegley following said bodily injuries, and if you further find from a preponderance of the evidence that the said blueness of the lips were visible marks that were the result of the bodily injury, if any, then you are instructed that as a matter of law, the Plaintiff has met the requirement of the policy requiring an injury that is evidenced by one or more visible contusions or wounds on the exterior of the body * * *.

In framing its instruction on the correlation between accident and disease as the cause of Kegley's death, the district court appears to have relied upon Mutual Benefit Health and Accident Ass'n v. Hudman, 385 S.W.2d 509 (Tex.Civ.App. 1964).

Subsequent to the trial of the case at hand, however, *Hudman* was reversed by the Supreme Court of Texas. Mutual Benefit Health and Accident Ass'n v. Hudman, 398 S.W.2d 110 (Tex.1965).[3] In holding the trial court in error, the court said that accidental injury "independent of other causes," means that the accidental bodily injuries must be the sole cause of death, and that death is not caused solely by accidental bodily injury if disease contributes to, concurs in, or

---

2. The court defined bodily injury to include "the incitement, acceleration or aggravation of any disease * * *."

3. The *Hudman* case involved facts unfamiliar to this case, and the insurance policy covered injuries received only while driving an automobile; but that policy, as the policy here issued by appellant Aetna, limited coverage to death from accidental injury independent of other causes. The principles to which the Texas court directed itself are equally applicable here.

aggravates the cause of death, excepting the situation where the disease or disorder is so remote or dormant that it does not materially contribute to the death or injury.[4] The court in *Hudman* said that the beneficiary had the burden of proving that the insured's death resulted solely from an accidental injury (overexertion). 398 S.W.2d at 113–114, 115.[5]

The Aetna policy, as contrasted with the policy before the Texas Supreme Court in *Hudman,* represents an attempt to place a heavier burden upon the beneficiary by providing that recovery is precluded if death was contributed to, a consequence of, or in any way attributable to bodily or mental infirmity or disease, even though the proximate or precipitating cause is a bodily injury caused by an accident. Of course, such a burden is limited by public policy, and, as the court in *Hudman* recognized, recovery is not defeated when the preexisting disease is a remote cause of death. The insured is not expected to be an Apollo or Hercules.[6]

When, as in this case, cause of death is a matter of dispute among medical experts, the jury must draw their own conclusion as to the cause of death. The court's instructions supply the jury with a formula which should enable them to draw a conclusion in accord with the law and facts of the case, presumptions, and burdens of proof. But, from the instructions given by the court below, the jury could have concluded that Kegley's death came within the terms of the policy, even though they believed a preexisting disease was a contributing or secondary cause. Such a conclusion would be in conflict with the law in Texas, as pronounced by *Hudman,* and the language of the policy. Specifically, the jury was not asked to determine if preexisting disease was a proximate, joint, contributing or concurrent cause of death.[7] Consequently, the precise burden of proof required by applicable Texas law was not placed upon appellee. This constituted reversible error.

In response to *Hudman,* appellee argues that secondary cause (as the district court instructed) and remote cause (as

---

4. With reference to remoteness, see 2 Richards, Insurance § 218 at 744 (1952).

5. The burden is displaced by proving by a preponderance of the evidence that the insured's death comes within the terms of the policy; i. e., that death was the direct result of a bodily injury caused by an accident *and that death was not contributed to by preexisting bodily infirmity or disease.* See Republic Nat'l Life Ins. Co. v. Bullard, 399 S.W.2d 376, 380 (Tex.Civ. App.1966), writ ref. n. r. e.; 22 Appleman, Insurance Law and Practice §§ 13401–04, 21 Appleman §§ 12171, 12141; 10 Couch, Insurance § 41:380, at 349 (1962); McNiece, Heart Disease and the Law 102 (1961).

As to the public policy limitation, see Aetna Life Ins. Co. v. Young, 113 F.2d 601, 602 (3 Cir. 1940).

6. For years, insurance companies have labored to devise a clause for use in accident benefit policies (and double-indemnity accidental death life policies) which would preclude recovery when death would not have resulted from the accidental bodily injury had there been no preexisting disease. See Bronson and Fields, The

Problem of Concurrent Causation of Death Under Health and Accident Policies, 1965 Ins. Council J. 241.

7. See Combined American Ins. Co. v. Tunnell, 311 S.W.2d 76, 77 (Tex.Civ.App. 1958).

It would appear that it was also error to instruct the jury that appellee could recover if mental stress was found to be a contributing cause. In Pan American Life Ins. Co. v. Andrews, 161 Tex. 391, 340 S.W.2d 787, 792, 93 A.L.R.2d 560 (1960), the Texas Supreme Court denied recovery under a similar policy provision where it was argued that psychic trauma was the cause of death, and said, "We can see no distinction between the case at bar and a fatal attack of heart failure suffered by an insured induced by the excitement of watching a football game or a television program, or in fact, worry brought about by financial or domestic problems if the mental disturbance is said to have caused a thrombosis which in turn caused the death." While the court was not there concerned with overexertion, the principles are identical.

approved by *Hudman*) are synonymous. But "remote" is further removed from the cause than "secondary," and they are not generally recognized as being synonymous. Webster, New International Dictionary (3d ed. 1961); Roget, Thesaurus (3d ed. 1962).[8]

█ It was also error for the district court to define proximate cause as "the moving and efficient cause, without which the injury in question would not have happened." In *Hudman*, the court specifically disapproved of the "but-for" test, i. e., that the death would not have resulted but for the accidental injury. 398 S.W.2d at 113.

In the second instruction complained of by the appellant, the trial court instructed the jury that if they believed an accidental bodily injury caused the blueness around the lips of Kegley, and if they found the blueness of the lips to be a visible mark that was the result of the bodily injury, as a matter of law this blueness was a visible contusion or wound on the exterior of the body.

This court also regards the determination of whether blueness of the lips is a visible contusion or wound to be a question of law, not of fact.

In support of the instruction given by the trial court appellee cites Pledger v. Business Men's Accident Ass'n of Texas, 228 S.W. 110 (Tex.Comm.App.1921), and Royal Casualty Co. v. Nelson, 153 S.W. 674 (Tex.Civ.App.1913). Both of these cases construed policies requiring visible marks as evidence of the accidental injury to the body.[9]

While the trial court treated the Aetna policy as one requiring only a visible mark produced by a bodily injury, a policy which requires evidence of a visible mark or other evidence of injury on the exterior of the body is very different from one which requires a visible contusion or wound on the exterior of the body, the latter being more restrictive. A visible contusion or wound is a special kind of mark or sign upon the exterior of the body. 10 Couch, Insurance § 41: 779, at 621 (1962). As a Texas court said in Royal Casualty Co. v. Nelson, 153 S.W. at 676: "The 'visible mark upon the body' required by the policy need not be a bruise, contusion, laceration, or broken limb, but may be any visible evidence of an internal injury. It need not be upon the surface of the body, but might be any physical effect observable from an outward indication * * *."

██ A contusion is defined as an injury to a person which affects subcutaneous tissues without breaking the skin, and is synonymous with bruise; a wound is described as an injury which causes the skin or other membrane to be broken. Zorn v. Aetna Life Ins. Co., 260 F.Supp. 730, 733 (E.D.Tex.1965); 10 Couch, Insurance § 41: 778, at 620 (1962). The testimony of all the medical witnesses was in accord with these accepted definitions.

Nonetheless, in American Nat'l Ins. Co. v. Fox, 184 S.W.2d 937, 943 (Tex.Civ. App.1944), writ ref. w. m., the court stated, as did the trial judge in this case, that the courts are not bound by the technical definitions of wound and contusion: "The kind of 'contusion' or 'wound' which the body must show in a heat stroke case naturally must be the kind of external

---

8. A secondary cause would be associated with the principal cause, although a secondary, alternative, or substitute cause. See Roget, Thesaurus § 148.8. A remote cause is separate and apart from the principal cause, and removed therefrom. Ibid. § 198.8.

9. Appellee also cites Barry v. United States Mutual Accident Ass'n, 23 F. 712 (Cir. Ct.E.D.Wis.1885); United States Mutual Accident Ass'n. v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60 (1889). The policy in *Barry* required an external and

visible sign of injury. Appellee cites Hann v. Life & Casualty Ins. Co. of Tenn., 312 S.W.2d 261 (Tex.Civ.App.1958). The court in *Hann* said it may have been error to instruct the jury as the district court did in our case, but did not decide the issue because the point had not been properly raised.

So far as this court can discern from the opinions of the cases cited by appellee, none of the cases involved blueness of the lips, at least not as the sole indication of bodily injury.

evidence that would be produced by a heat stroke," i. e., the kind of contusion or wound which corresponds with the nature of the bodily injury suffered. If *Fox* applies to this case, in the absence of convincing evidence that the Texas Supreme Court would decide differently, this court is *Erie* bound to follow the *Fox* rationale. Stoner v. New York Life Ins. Co., 311 U.S. 464, 467, 61 S.Ct. 336, 85 L.Ed. 284 (1940); Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Is blueness of the lips a visible contusion or wound which corresponds with a ruptured blood vessel and a coronary thrombosis? Before attempting to resolve the question, it will be helpful to gain some insight into the causes of blueness of the lips, medically denominated "cyanosis." [10] Because this is a question of law, rather than relying exclusively upon the testimony of the medical experts who testified at the trial, the court has consulted medical authority for assistance in achieving a more complete understanding of the medical terminology.

Cyanosis is described as a "bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood in the lungs or to an abnormally great reduction of the blood in its passage through the capillaries." Stedman, Medical Dictionary (17th ed. 1949). Or put another way, cyanosis is a change in the color of the blood caused by the presence of venous blood in dilated superficial blood vessels, in which an abnormally high percentage of the hemoglobin has lost its oxygen. The cyanosis is made visible by the dilation of the blood vessels of the skin and mucous membrane and is frequently seen in the lips, where the blood vessels are numerous and most exposed to the surface. White, Heart Disease 58 (1956). This is essentially the definition of cyanosis given by the medical experts during the trial of this case.

There are several causes for a deficiency of oxygen in the blood: (1) slowing of the peripheral circulation by cold or vasomotor nervous stimulation, (2) obstruction to the return of blood to the heart, (3) congestion of the lungs due to heart trouble, (4) certain congenital heart defects, (5) disease of the lungs, (6) tracheal or bronchial obstruction, and (7) high altitudes. White, Heart Disease 58–60 (1956). Cyanosis is a prominent feature of many forms of heart disease. III The Cyclopedia of Medicine 195 (1966).

When a person suffers a coronary thrombosis, there is a partial or complete obstruction of a blood vessel by a clot formed within the space of the vessel tube. If the blockage or occlusion is severe, the flow of the blood to a part of the heart is seriously reduced, and, as a consequence, the supply of oxygen in the blood is reduced. When this occurs, visible cyanosis normally follows.[11] Especially is this true if the blood supply to a part of the heart is so impaired as to cause a myocardial infarction, i. e., death of a portion of the heart muscle. 8 Traumatic Medicine and Surgery for the Attorney 300, 757 (1962); White, Heart Disease 517–66 (1956).

A coronary thrombosis is generally the result of a diseased heart. White, ibid; IV The Cyclopedia of Medicine 305. But medical authorities are in general agreement that a blood vessel could rupture in a normal heart and hemorrhage to such a degree that it would clot a coronary artery, producing a coronary thrombosis.

10. During the trial, the medical witnesses identified the blueness which was observed in Joseph Kegley's lips as cyanosis.

11. Dr. Prout, who examined Kegley after the thrombosis, stated that he did not notice Kegley's lips being particularly blue, although he did observe a cyanotic pallor characteristic of all dead persons.

It has been said, however, that "Cyanosis of the skin and mucous membrane is a sign much sought for, but unless the cyanosis is well marked or constant it may be unimportant, since it often results from temporary local disturbances of the circulation and not from serious disease of the heart, lungs, and blood vessels." White, Heart Disease 58 (1956).

Now, is there a correlation between the bodily injury suffered by Kegley and cyanosis? The court in *Fox* concluded that sunstroke was the sole cause of death and, with this extremely important part of the puzzle solved, only had to determine if there was evidence on the exterior of the body which corresponded with the injury caused by the sunstroke.[12]

Under Texas law, a death certificate properly filed is prima facie proof of the information, therein contained. Vernon's Ann.Tex.Rev.Civ.Stat. Art. 4477, rule 54a (1966). Kegley's death certificate identifies the cause of death as a coronary thrombosis. It can be presumed, therefore, that a coronary thrombosis was the sole cause of death.

Yet, without autopsy, what caused the coronary thrombosis is a matter for conjecture. The medical experts called by appellee testified that *assuming* Kegley had a normal heart, overexertion probably caused a blood vessel to rupture, leading to a coronary thrombosis. Since no autopsy was performed on the deceased, these medical witnesses built their opinion upon the assumption that the deceased had a normal heart, as stated by counsel in his hypothetical illustration. With this as an accepted fact,

the medical experts then concluded that a blood vessel must have ruptured and that a coronary thrombosis caused the death.

Appellee adopted the ruptured blood vessel as the bodily injury received by Joseph Kegley, and it is appellee's position that the coronary thrombosis was caused by the ruptured blood vessel.

The instructions given by the trial court allowed the jury to choose between two possible proximate causes of the coronary thrombosis, disease or an accidental bodily injury. It is impossible, therefore, to determine which, if either, the jury found to be the sole proximate cause of death. The problem cannot be resolved by inductive reasoning, for cyanosis, the only evidence approximating a visible contusion or wound, would correspond with a coronary thrombosis, whether caused by a ruptured vessel, disease, or a combination of the two.

*Fox*, therefore, is not authority for this court.[13] On the other hand, there is authority for this court to conclude that the Texas Supreme Court would not follow the principles laid down in *Fox*.[14]

■ Contrary to the district court's instruction, the Texas law is settled that terms used in an insurance policy are in-

---

12. The evidence included body temperature of 109, presumably accompanied by rapid pulse, hot dry skin, flaccid muscles, scarlet blotches on the face, nausea, palpitation, and under circumstances likely to produce a sunstroke.

13. There are other reasons why American Nat'l Ins. Co. v. Fox should not be authority in this case. For one, the policy construed in *Fox* did not exclude coverage for internal injuries not evidenced by a contusion or wound on the exterior of the body. The policy would have covered such injuries if revealed by autopsy; but the Aetna policy would not. Secondly, *Fox* was concerned with death caused by heat from the sun (heat stroke), which is established under Texas law as an accidental bodily injury. The court in *Fox* said it was compelled to reach the result it did because the policy insured against heat stroke. Thirdly, the policy in *Fox* covered death caused by a bodily injury "effected solely through external, violent, and

accidental means." In construing a policy similar to Aetna's, the Texas Supreme Court refused to consider as authority other Texas cases dealing with "external, violent, and accidental means" provisions. Mutual Benefit Health & Accident Ass'n. v. Hudman, 398 S.W.2d at 113.

14. In Pan American Life Ins. Co. v. Andrews, 161 Tex. 391, 340 S.W.2d 787, 791, 93 A.L.R.2d 560 (1960), a double indemnity provision required a visible contusion or wound on the body (or internal injury revealed by autopsy). The court, with reference to death from poison, asphyxiation and drowning, (agents which act internally and normally produce blue lips), said: "These agents, of course, *do not leave visible contusions or other outward marks.* * * *" (Emphasis added.) Without an autopsy, the court reasoned, there could be no recovery for injuries caused to internal organs of the body without any visible contusions or wounds.

tended to be construed as commonly and ordinarily understood. American Casualty Co. of Reading, Penn. v. Myrick, 304 F.2d 179, 183, 96 A.L.R.2d 1352 (5th Cir. 1962); Western Reserve Life Ins. Co. v. Meadows, 152 Tex. 559, 261 S.W.2d 554, 557 (1953) rehearing denied; 32 Tex.Jur., Insurance § 57 (1962). With no Texas authority on point, the court must determine if cyanosis is, as a matter of law, a contusion or wound, as those terms are commonly understood.

As previously defined, a contusion is ordinarily understood to be a bruise without a break in the skin, and a wound is understood to be an injury accompanied by a break in the skin. Cyanosis is described as a blueness of the skin or mucous membrane resulting from a deficiency of oxygen in the blood. While cyanosis may appear in the lips after a ruptured artery has caused a coronary thrombosis, neither the medical experts who testified at the trial nor the authorities encountered in the court's research equate cyanosis and a visible contusion or wound. Indeed, by definition, cyanosis is not a contusion or wound.

Dr. Prout, who examined Kegley and filled in the death certificate, responded to the following questions:

"Q. The cyanotic pallor associated with death is not due to a contusion or wound, this is correct, isn't it?

"A. Yes, sir.

"Q. It is just a grayness in color and is common to a great majority of deceased persons,

"A. Yes, sir."

Dr. McDaniel, another medical witness who testified at the trial, agreed with Dr. Prout's statement:

"Q. All right, is cyanosis the same thing as a wound or contusion?

"A. No."

The blueness observed in the deceased's lips was but an indication of what may have been either an internal bodily injury, a contusion or a wound; possibly a visible sign or mark, but not itself a contusion or wound.

Legal authorities and courts have refused to recognize cyanosis as a visible contusion or wound on the exterior of the body. Massachusetts Mutual Life Ins. Co. v. Pistolesi, 160 F.2d 668, 670, (9th Cir.), cert. denied, 332 U.S. 759, 68 S.Ct. 59, 92 L.Ed. 345 (1947); Paul Revere Life Ins. Co. v. Stanfield, 151 F.2d 776, 777 (10th Cir. 1945), cert. denied, 327 U.S. 795, 66 S.Ct. 825, 90 L.Ed. 1021 (1946); 1A Appleman, Insurance Law and Practice § 395 (1947); 10 Couch, Insurance § 41: 781 (1962).

▆ As a matter of law, cyanosis is not a visible contusion or wound on the exterior of the body, as those terms are normally understood and as intended in the policy. Therefore, there being no evidence of a contusion or wound upon the exterior of the body, the death did not come within the terms of the policy, and appellee cannot recover.

The judgment of the trial court is reversed, and the case is remanded, with directions to enter judgment for the defendant.

## ON PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, Rule 25a, subpar. (b), the Petition for Rehearing En Banc is denied.